929 P.2d 691 (1996)
The BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, COLORADO; Douglas County, Colorado School District RE-1; and Robert A. Christensen, James R. Sullivan, and Suzy McDanal, in their capacities as members of the Douglas County Board of County Commissioners, Petitioners,
v.
BAINBRIDGE, INC., a Colorado corporation; Village Homes of Colorado, Inc., a Colorado corporation; Falcon Development Group, Inc., d/b/a Falcon Homes, a Colorado corporation; LHLI, Ltd., a Colorado corporation; Virden Homes, Inc., a Colorado corporation; The Genesee Company, a Colorado corporation; Sattler Homes, Inc., a Colorado corporation; and Sugarbush Homes, Inc., a Colorado corporation, Respondents.
The BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO; St. Vrain Valley, Colorado School District; Ron Stewart, Homer Page, Sandy Hume, in their capacities as members of the Boulder County Board of County Commissioners, Petitioners,
v.
HOMEBUILDERS ASSOCIATION OF METROPOLITAN DENVER; Puma Property Partners; Bainbridge Inc.; McStain Enterprises, Inc.; and I.T.S. Corporation, Respondents.
Nos. 95SC354, 95SC479.
Supreme Court of Colorado, En Banc.
December 9, 1996.
As Modified on Denial of Rehearing January 13, 1997.
*694 J. Mark Hannen, Douglas County Attorney, Castle Rock, for Petitioners Board of County Commissioners of Douglas County, Robert A. Christensen, James R. Sullivan and Suzy McDanal.
Caplan & Earnest, L.L.C., Richard E. Bump, W. Stuart Stuller, Boulder, for Douglas County School District RE-1.
Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Thomas J. Ragonetti, J. Thomas MacDonald, Brad W. Schacht, Denver, for Respondents in both cases.
David W. Broadwell, Denver, for Amicus Curiae Colorado Municipal League in both cases.
Lauren B. Kingsberry, Denver, for Amicus Curiae Colorado Association of School Boards in both cases.
Hall & Evans, L.L.C., Thomas J. Lyons, Tracey P. Robinson, Denver, Amicus Curiae Colorado Counties, Inc. in both cases.
Patrick C. Boyle, Denver, for Amicus Curiae Colorado Association of Commerce and Industry in both cases.
Caplan and Earnest, Richard E. Bump, Kathleen O. Nistico, Boulder, for Petitioner St. Vrain Valley, Colorado School District.
H. Lawrence Hoyt, Boulder County Attorney, Madeline J. Mason, Deputy Boulder County Attorney, Boulder, for Petitioners The Board of County Commissioners of Boulder County, Colorado, Ron Stewart, Homer Page and Sandy Hume.
Justice HOBBS delivered the Opinion of the Court.
In these consolidated appeals we granted certiorari[1] before judgment, pursuant to C.A.R. 50, to review orders of the district courts for Douglas and Boulder Counties granting motions for summary judgment invalidating new development school impact fees. Both courts concluded that the County Commissioners lacked authority, beyond the statutorily prescribed exaction for school purposes, to require an additional payment for the benefit of school districts. Both courts ruled that the state had preempted the arena of public school finance; in addition, the Boulder County District Court concluded *695 that the school impact fee is an invalid regulatory fee.
Petitioners are the Douglas and Boulder County Commissioners and individual commissioners (the Counties). They contend that authority exists in various Colorado land use statutes for school impact fees to be assessed at the time a building permit or certificate of occupancy is sought by the builder or occupant of a new residential dwelling, in addition to the statutorily prescribed exaction required in connection with the approval of the subdivision where the building lot is located.
While we disagree that the state has preempted the arena of school finance, we agree with the district courts that the Counties were not authorized to charge and collect these school impact fees. We base our conclusion, as a matter of statutory construction, on the legislature's decision to fix the time and amount of the school exaction fee that can be charged. This fee is owed as part of subdivision approval and is limited to the "full market value" of sites and land areas that can be reserved for school purposes under section 30-28-133(4)(a)(I) and (II), 12A C.R.S. (1986 & 1996 Supp.). The county resolutions require a second payment as a prerequisite to issuance of a building permit or certificate of occupancy above and beyond the required zoning and subdivision approvals. Since we find no express or implied authority for the Counties to override the legislature's choice to specify both the maximum amount and the timing of the school fee, we find that the imposition of an additional school fee was without authority. Because of our construction of the relevant statutory provisions, we need not and do not determine whether the school impact fee itself is a valid regulatory fee.[2]

I.
The operative facts of these consolidated cases are not disputed.

A. Douglas County Impact Fee

The Board of Education for Douglas County School District RE-1, responding to significant increases in student enrollment due to substantial population growth in the county, formally requested the County Commissioners for Douglas County to take the necessary steps to deny the approval of more subdivision plats, or, in the alternative, to implement the assessment of a school impact fee to be collected by the county and remitted to the school district for the acquisition, construction, or expansion of school facilities.
In February 1992, the Douglas County Commissioners adopted Resolution No. R-992-017 establishing conditions and procedures for the imposition of a school impact fee. In March 1992, the school district fulfilled the conditions of the resolution, held several public meetings to discuss the impact fee proposal, and requested the imposition of the fees.
After a public hearing was held to discuss the fees, the Board passed and adopted Resolution No. R-992-061 (resolution) in July 1992. The recited purposes of the resolution were to assist in implementing the County Master Plan, regulating land use and development, and ensuring that new development bears its share of the cost of either expanding existing schools or constructing new schools needed to serve students in growth areas. The resolution is applicable to previously approved subdivisions and lots: "Any person who, after the effective date of this resolution, requests either a residential certificate of occupancy, or an electrical meter release for a residential mobile home, shall pay a school impact fee in the manner and *696 amount set forth in this resolution." Board of County Commissioners of Douglas County, Resolution R-992-062 § 5(A) (July 22, 1996).[3] Under the resolution, the impact fee amount to be collected in connection with a certificate of occupancy is set forth in a graduated scale depending upon the square footage of the residential unit. The fee owed for a two thousand square foot home, for example, is $1,660.00.[4]
At oral argument, we were advised that, by the end of 1991, 8,701 platted, buildable, residential lots had been approved in Douglas County. A "plat" is defined as an instrument prepared in accordance with the applicable subdivision regulations consisting of a map and supporting materials for the purpose of recording real estate interests in certain described land. § 30-28-101(5), 12A C.R.S. (1986). After the effective date of the Douglas County resolution, even as to previously approved lots, any person requesting a certificate of occupancy for a residence, or an electrical meter release for a residential mobile home, must pay a school impact fee in addition to the land dedication or in-lieu fee, or combination thereof, paid by the developer in connection with subdivision approval. The collected fees are deposited in a trust fund for the benefit of the school district to be used only for acquisition, construction, or expansion of school facilities to benefit new residents.
The detailed methodology for determining the fee to be paid requires calculation of the cost of the new school facilities needed to provide sufficient school capacity to serve a single home, then reducing that amount by a credit for the anticipated property tax payments expected to be made by a new home from that property over the life of existing and anticipated general obligation bonds. Certain exemptions from payment of the fee are provided, such as for non-residential buildings, nursing homes, or developments subject to recorded covenants restricting the age of residents.
The county commissioners declined to adopt the school district's alternative request to deny the approval of new subdivision plats because of a lack of adequate schools to serve new residents.
In August 1992, nine home builders (the builders) and the Homebuilders Association of Metropolitan Denver (HBA)[5] commenced this lawsuit in Douglas County District Court challenging the fees.[6] The County and the School District filed a motion for judgment; the builders filed a cross-motion for summary judgment on the pleadings or, in the alternative, for summary judgment.
*697 On July 11, 1994, the Douglas County District Court granted the builders' cross-motion for summary judgment, concluding that the County did not have the authority to assess the school impact fees and the state had preempted the arena of public school finance.[7] Douglas County was permanently enjoined from imposing or collecting school impact fees, prohibited from expending any collected fees, and required to refund all of the fees paid.[8] The court of appeals stayed implementation of the permanent injunction pending this appeal.

B. Boulder County Impact Fees

Boulder County also confronts burgeoning growth. Population projections made in 1993 indicated that by 1995 Niwot Elementary School (Niwot) and Sunset Middle School (Sunset) would be significantly over capacity. Attempting to address this problem, the St. Vrain School District, which includes both Niwot and Sunset, proposed a school impact fee methodology whereby any person desiring to build within that school district must pay the impact fee to the school district in order to receive a building permit from Boulder County.
The Boulder County Planning Commission reviewed these proposed regulations for the St. Vrain School District area in public hearings. Following another public hearing by the Boulder County Board, the regulations were adopted by the Commissioners in May of 1993. The resolution and new regulations were formulated to obtain revenue for school purposes from builders or owners of already approved lots who now seek to construct a home. The resolution is explicit on this point. Its findings state that "although significant new development is not likely to be approved by the County, there are approximately 700 buildable lots in the Niwot ... attendance area." Board of County Commissioners of Boulder County, Resolution 93-57 § 7 (May 20, 1993). The fee in the Niwot attendance area was set at $1,910.00 per dwelling unit, and $1,086.00 per dwelling unit in the Sunset attendance area. The record indicates that most of the new homes will be located in both attendance areas and would be subject to both fees. Boulder County's impact fee resolution provides that the chief building official of the county cannot issue a building permit for a new residential dwelling unless the applicant provides a receipt from the St. Vrain School District showing payment of the impact fee to the district.
The HBA and several home builders (the builders) filed a complaint one month later challenging the legality of the impact fees. The allegations were the same as those brought in Douglas County. Boulder County and the School District filed a motion for summary judgment on all claims arguing that counties are vested with broad land use authority sufficient to enable requiring new development to build, or pay for, needed public facilities such as schools. The builders filed a cross-motion for judgment on the pleadings or for summary judgment on all claims. The district court granted the builders' cross-motion for summary judgment for the same reasons as the Douglas County District Court, and, in addition, ruled that the school impact fee is not a valid regulatory fee.
The district court entered an order enjoining the County from collecting or spending the fees, and requiring that all such funds collected be refunded. The district court stayed its judgment pending appeal.
The primary consideration of both Counties was to raise revenue for school construction from approved subdivisions which were not yet occupied. Prior to the impact fee adoption, Douglas County had already platted and approved 8,701 residential lots, and Boulder County had already approved approximately 700 buildable lots. After the effective date of the resolutions, the impact fees were collected from any person requesting either a certificate of occupancy or a building permit. Thus, this case involves application of the fee requirement to dwellings *698 built on lots within subdivisions which had been approved under then existing county regulations for which the land dedication or the in-lieu fee payment was or could have been applicable.

II.

Summary of Decision
Counties have considerable legislative powers to adopt zoning and subdivision regulations. The question here is whether a specific statutorily-prescribed developer exaction to benefit schools constitutes but a minimum which can be enlarged upon by a county under its land use authority to require an additional fee at the time a certificate of occupancy or a building permit is sought.
Although the land use laws of this state grant broad authority to counties for control of land use through zoning, subdivision, and Planned Unit Development approval or denial, we confront in this case a very specific statutorily prescribed developer exaction for the benefit of the school district by which a fee can be imposed upon the developer of an approved subdivision not to exceed the full market value of the land dedication within the subdivision as required by section 30-28-133(4)(a)(II), 12A C.R.S. (1986 & 1996 Supp.). Counties are not free to enlarge on this exaction by legislation of their own design imposing additional fees to benefit the school district payable at the time a building permit or certificate of occupancy is sought.
We must construe the statutory provisions to accomplish their reasonable and intended result. State Eng'r v. Castle Meadows, Inc., 856 P.2d 496, 504 (Colo.1993). To the extent that statutory provisions conflict, the specific provision prevails over the general, unless the seemingly conflicting provisions may be construed to give effect to both. § 2-4-205, 1B C.R.S. (1980); see also Smith v. Zufelt, 880 P.2d 1178, 1183 (Colo.1994). Here, a specific statutory provision controls the maximum school related fee that can be exacted and prescribes when and how it shall be paid, § 30-28-133(4)(a), 12A C.R.S. (1986 & 1996 Supp.). This fee is derived from sale of the land for school sites, or is payable in lieu of the land dedication, or is to be combined with a land dedication. The payment is due at the time the subdivision plat is approved. This exaction covers all lots within the approved subdivision. The county commissioners have no implied power to require additional monetary exactions at the time of building permit or certificate of occupancy issuance above the maximum cap that the General Assembly has imposed on such payments under section 30-28-133(4)(a)(II).

A.
Having development pay all or part of its way is a familiar concept in land use planning and regulation. Financing public facilities in connection with growth is a particular concern of local jurisdictions. See Susan P. Schoettle & David G. Richardson, Nontraditional Uses of the Utility Concept to Fund Public Facilities, 25 Urb. Law. 519, 519-22 (1993). Local governments have required various forms of development exactions in order to apportion some of the capital expense burden they face to the developers and new residents. See Frona M. Powell, Challenging Authority for Municipal Subdivision Exactions: The Ultra Vires Attack, 39 DePaul L.Rev. 635, 635-36 (1990). Exactions are compelled dedications or payments adopted under the police power of the state. Requirements have included dedication of land and facilities, money in lieu of such dedication, and impact fees. Id. at 639. Impact fees, when authorized by the legislature to be assessed, can be collected at the time a building permit is issued; they are levied by local governments on new developments in order to generate revenue for capital facilities necessitated by new development. Donald G. Hagman & Julian C. Juergensmeyer, Urban Planning and Land Development Control Law § 9.8 (2d ed.1986). Impact fees are functionally similar to fees charged in lieu of dedication requirements. Id.
Local governments in Colorado currently have the authority to approve subdivisions and, at the same time, require land dedication, or fees in lieu thereof (in-lieu fees), or a combination of both capped by a market value limitation, for school and park purposes. *699 § 30-28-133(4)(a)(II). To determine whether a separate and additional fee for school purposes may be required by the Counties, we must look to the statutes which delegate and limit the powers of counties.
A county is not an "independent governmental entity existing by reason of any inherent sovereign authority of its residents; rather, it is a political subdivision of the state, existing only for the convenient administration of the state government, created to carry out the will of the state." Board of County Comm'rs v. Love, 172 Colo. 121, 125, 470 P.2d 861, 862 (1970); accord Board of County Comm'rs v. Bowen/Edwards Assocs., 830 P.2d 1045, 1055 (Colo.1992).
As political subdivisions of the state, counties have only those powers that are expressly granted to them by the Colorado Constitution or by the General Assembly. Bowen/Edwards, 830 P.2d at 1055. The power delegated to counties by the General Assembly operates to confer all of the implied powers reasonably necessary to the proper exercise of those powers that are expressly delegated. Beaver Meadows v. Board of County Comm'rs, 709 P.2d 928, 932 (Colo. 1985).
When Douglas and Boulder Counties adopted their school impact fee regulations, there was no express statutory provision allowing imposition of such a fee at any stage of the land use approval process, other than the in-lieu fee exaction that the legislature specifically delineated and capped for school purposes as part of subdivision approval. Thus, we must examine the implied powers of counties to assess an additional school fee when a certificate of occupancy or building permit is sought.
Statutes are to be construed as a whole to give a consistent, harmonious, and sensible effect to all of their parts. Bluewater Ins. Ltd. v. Balzano, 823 P.2d 1365, 1372 (Colo.1992) (citing Martinez v. Continental Enters., 730 P.2d 308, 315 (Colo.1986)). When a court interprets a comprehensive legislative scheme, it must "give meaning to all portions thereof and construe the statutory provisions to further the legislative intent." A.B. Hirschfeld Press, Inc. v. City & County of Denver, 806 P.2d 917, 920 (Colo. 1991). A court "seek[s] to determine the intent of the legislature as expressed in the language it selected." Triad Painting Co. v. Blair, 812 P.2d 638, 644 (Colo.1991); accord, e.g., Martin v. Montezuma-Cortez Sch. Dist. RE-1, 841 P.2d 237, 246 (Colo.1992). In construing a statute, a court should look first to the plain language of the statute, and the words used should be given their plain and ordinary meaning. Montezuma-Cortez Sch. Dist. RE-1, 841 P.2d at 246. Finally, if the statutory language is clear and unambiguous the statute must be interpreted as written, and there is no need to resort to the other rules of statutory construction. Deutschendorf v. People, 920 P.2d 53, 60 (Colo.1996). Furthermore, statutory prescriptions or exemptions dealing with conditions of subdivision approval authority are to be strictly construed. Beaver Meadows v. Board of County Comm'rs, 709 P.2d 928, 935 (Colo. 1985); accord Pennobscot, Inc. v. Board of County Comm'rs, 642 P.2d 915, 919 (Colo. 1982).

B. The County Planning and Building Codes

The County Planning and Building Codes (the Planning Code), sections 30-28-101 to -209, 12A C.R.S. (1986 & 1996 Supp.), empower the county commission to plan and zone all or any part of the unincorporated territory within its jurisdiction to provide for its physical development. § 30-28-102, 12A C.R.S. (1986).
Counties must first develop a master plan for the physical development of the unincorporated territory. § 30-28-106, 12A C.R.S. (1986). The plan must be made
with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the county or region which, in accordance with present and future needs and resources, will best promote the health, safety, morals, order, convenience, prosperity, or general welfare of the inhabitants.
§ 30-28-107, 12A C.R.S. (1986). The uses of land should include those that create conditions favorable to health, safety, energy conservation, transportation, recreational, educational, *700 and cultural opportunities. Id. Uses of land are delineated and restricted by county zoning plans and resolutions. See §§ 30-28-111 to -113, 12A C.R.S. (1986 & 1996 Supp.). Subdivision regulations operate to provide the basis for approving or disapproving the design of the platted subdivision. §§ 30-28-133, -136 to -137, 12A C.R.S. (1986 & 1996 Supp.).
Close coordination with school districts regarding their plans and resources to accommodate new residents has a logical and important connection with the planning, zoning, and subdivision review process. The county commissioners are authorized to adopt zoning plans which, among other matters, regulate "the location, height, bulk, and size of buildings ... [the] percentage of lot which may be occupied, the size of lots, courts, and other open spaces, the density and distribution of population, the location and use of buildings and structures for trade, industry, residence, recreation, public activities, or other purposes." § 30-28-111(1), 12A C.R.S. (1986). The commissioners may adopt zoning regulations, § 30-28-113(1), 12A C.R.S. (1986), which may be enforced by means of withholding building permits, § 30-28-114, 12A C.R.S. (1986). The county may fix a reasonable schedule of fees for building permits, § 30-28-114, but this section makes no reference to a school construction fee. Rather, that subject matter is specifically addressed in the applicable subdivision requirements.
Subdivision developers must comply with lengthy pre-approval requirements. See § 30-28-133(3)(a) to (d), 12A C.R.S. (1986). All proposed plans for a subdivision must be distributed to the appropriate school districts, § 30-28-136(1)(a), 12A C.R.S. (1986), which, in turn, are required to submit specific recommendations with regard to the adequacy of school sites and the adequacy of school structures, § 30-28-136(2), 12A C.R.S. (1986 & 1996 Supp.).
Among the obligations that shall be addressed in the county's subdivision regulations are those requiring land site dedication for schools and parks reasonably necessary to serve the residents of the subdivision, in-lieu fees, or a combination of both up to the full market value of such land.[9]
After approval of the subdivision plat and receipt of the sites or land area dedications or payments in lieu thereof, the board of county commissioners is required to notify the school district of the availability of the land or moneys. When the school district demonstrates a need for the land or moneys, the board is to allocate the "land or moneys for subject project" immediately by transfer to the school district. § 30-28-133(4.3), 12A C.R.S. (1986).[10] The moneys can be used by *701 the school district for "acquisition of reasonably necessary sites and land areas," for "other capital outlay purposes for schools," and "growth-related planning functions by school districts for educational purposes." § 30-28-133(4)(a)(II)(A) and (C). Under these provisions, exaction payments can be utilized for a project on or off the site of the subdivision.
Clearly, the General Assembly has designated subdivision regulations and subdivision review, taking into account recommendations of the commenting agencies, as the context for evaluating the educational opportunity which will be afforded to the future residents of the platted lots. The right of the subdivider to record the existence of buildable lots that can be sold within the subdivision depends on county plat approval. "[F]inal approval of a subdivision plan or plat," § 30-28-133(4.3), triggers the school district's use of the land, in-lieu payments, or combination thereof. This provision straightforwardly confirms that approval of the final plat is the time at which the school payment obligation is finalized.[11] Thus has the legislature addressed the nature, extent, and disposition of the monetary payments that can be exacted for the subdivision and its platted lots, absent developer agreement to supplement the exaction with other measures included in a public improvements agreement proposed by the developer and approved by the county in connection with the subdivision.
A developer must meet all zoning regulations and subdivision regulations. Shoptaugh v. Board of County Comm'rs, 37 Colo. App. 39, 42, 543 P.2d 524, 527 (1975). In Beaver Meadows v. Board of County Commissioners, 709 P.2d 928, 938-39 (Colo.1985), we stressed that properly adopted regulations govern the approval or denial of proposed development plans. Although the county there had authority to require provision of emergency medical services, it had not adequately included this contingency in its regulations. Id. at 939.
We have reiterated that subdivision regulations are adopted pursuant to legislative procedural norms to ensure that those affected by the proposed regulations are given notice and an opportunity for hearing. Board of County Comm'rs v. Conder, 927 P.2d 1339, 1347-1348 (Colo.1996). Inclusion of applicable requirements by means of subdivision regulations provides the developer with notice as to the basis for reviewing the subdivision plan and obtaining the county approval that is a prerequisite to recording the final approved plat. The primary role of subdivision control is to prevent ill-conceived development which is beyond the reach of essential services. Robert M. Anderson, *702 American Law of Zoning § 1.15 (3d ed.1986).
Assuming local government compliance with the notice and hearing requirements attendant to valid zoning and subdivision regulations, see Theobald v. Board of County Comm'rs, 644 P.2d 942, 950 (Colo. 1982), a subdivision proposal may be denied based on such regulations for lack of available schools to serve the residents of the proposed new development or it may be granted based on exercise of the statutory exaction or a public improvements agreement negotiated with the developer and, when a school structure is involved, the school district under sections 22-32-122 and -124, 9 C.R.S. (1995). This is the evident intent in the General Assembly's prescription that a school district must be afforded the opportunity to comment on school availability to serve the proposed development. See § 30-28-136(2).
Here, Douglas and Boulder Counties seek to impose an additional school fee after the subdivision and the platted lots therein have received all requisite land use approvals, including county approval of the public improvements agreement for the subdivision pursuant to section 30-28-137, 12A C.R.S. (1986 & 1996 Supp.).
Negotiation of a public improvements agreement is the context for assessing, agreeing upon, if agreement can be reached, and implementing the infrastructure design of the new community or the proposed addition to an existing community. When the proposed subdivision plan is submitted to the county commissioners or their designated representative, the commenting agencies named in section 30-28-136, 12A C.R.S. (1986 & 1996 Supp.), submit the results of their review along with their recommendations. These commenting agencies include school districts, neighboring municipalities within a two-mile radius of the proposed subdivision, the planning commission, the local utility, the local improvement and service district or other pertinent water entity, the soil conservation district board, the county, the regional or state health department water quality and sanitation division, the state water engineer, and other agencies who have responsibility under Colorado law for health, safety, and welfare concerns of Colorado residents.
The subdivision plan is then finalized, and obligations to be undertaken by the developer, in the event of subdivision approval, are embodied in an enforceable public improvements agreement before the final plat can be recorded. § 30-28-137(1). Such agreements contain security provisions to assure construction of the improvements, see §§ 30-28-137(1)(a) and 30-28-101(11), 12A C.R.S. (1986), and may be accompanied by
[o]ther agreements or contracts setting forth the plan, method, and parties responsible for the construction of any required public improvements shown in the final plat documents which, in the judgment of said board, will make reasonable provision for completion of said improvements in accordance with design and time specifications.
§ 30-28-137(1)(b).
Thus, section 30-28-137(1)(b) provides authority not only for security arrangements but also for any combination of plans and agreements negotiated between the developer or developers and the county to assure construction of agreed-upon improvements. Such plans and agreements can address school needs in response to the comments filed by the affected school district under section 30-28-136(2). In this negotiation context, the applicant and the county are able to assess the essential needs of the proposed community addition, costs and benefits of proposed features, and the availability of public and developer supplied resources which can be pooled to serve the new residents. See § 30-28-133.5(3), 12A C.R.S. (1996 Supp.).
Developers propose what shall be undertaken utilizing developer resources but the county determines whether a subdivision plan can be approved, taking into account the developer proposals, the comments of county and planning commission staff and the commenting agencies, and the public. § 30-28-133.5(5), 12A C.R.S. (1996 Supp.). Infrastructure improvements undertaken with developer *703 resources must meet the appropriate standards of design, as required by sections 30-28-137(1) to (2) and 30-28-133(5), 12A C.R.S. (1986), and section 30-28-133.5(3) to (4), 12A C.R.S. (1996 Supp.), and in the instance of schools, sections 22-32-122 and -124. The authority of the school district to comment on school structure needs and design is additionally set forth in section 30-28-136(2), requiring the school district to review and comment on every proposed subdivision involving twenty or more dwelling units.
Accordingly, the legislature chose to focus on subdivision review as the context for examining whether educational opportunity will be available to the new residents. This is accomplished by referral of the plan to the school district. Through its comments, the district may advise that the statutory exaction will be sufficient when combined with other available resources, that the exaction is not needed, or that the exaction will not be sufficient. When the exaction will not be sufficient and the school district determines that educational opportunity cannot be afforded to the new residents, denial of the subdivision may occur in the absence of an adequate public improvements agreement under section 30-28-137 and sections 22-32-122 and -124.
Denial is to be based on failure to conform with requirements of an adopted resolution, ordinance, or regulation. § 30-28-133.5(1), 12A C.R.S. (1996 Supp.). A decision denying the application will be upheld if competent evidence in the record supports the denial; such evidence can include recommendations and documentation from the commenting agencies, such as school districts. Cf. Board of County Comm'rs v. O'Dell, 920 P.2d 48, 51 (Colo.1996).
Under the Douglas and Boulder County resolutions, an additional exaction outside of the zoning and subdivision review and approval process and above and beyond the applicable public improvements agreement is required; it must be paid by the builder or owner of a platted lot in an approved subdivision who proceeds to construct a home. But our prior cases do not support expanding upon the stated statutory exaction. The legislature has selected subdivision approval as the trigger for payments made for the benefit of school districts. The maximum payment that can be exacted is payable by the subdivider, not the eventual owners of the platted lots and homes thereon. This payment is a function of the land dedication that could be required. The extent of the land dedication, in turn, is subject to the commission's rulemaking authority. Section 30-28-133(4)(a) states that the board of county commissioners shall adopt regulations governing "[s]ites and land areas for schools ... reasonably necessary to serve the proposed subdivision and the future residents thereof." The amount of any such payment for an approved subdivision shall not exceed the market value of a land dedication reasonably necessary to serve the residents of the subdivision: such payments shall "not exceed the full market value of such sites and land areas." § 30-28-133(4)(a)(II).
In Cimarron Corp. v. Board of County Commissioners, 193 Colo. 164, 169, 563 P.2d 946, 949 (1977), we invalidated a county subdivision regulation which required both a land dedication and payment of an in-lieu fee; the statutory choice was one or the other, and the county could not require additions thereto: "`In lieu' means `instead of' or `in the place of.' It does not mean `in addition to.' It is clear, therefore, that these regulations exceed the county's statutory authority and are invalid." Cimarron, 193 Colo. at 169, 563 P.2d at 949 (citations omitted). The General Assembly subsequently amended this section to allow a combination of land dedication and in-lieu fees.[12] But this amendment did not contemplate that additional monetary exactions to benefit school construction could be imposed by county resolution outside of the subdivision requirements, nor did it undermine the essential holding of Cimarron limiting such exactions to those delineated by the legislature.
Though the legislature could have chosen to assess a school fee at the time of building construction, it chose instead to require payment of the fee at an earlier stage of the *704 county's processwhen approval is sought and granted for the proposed subdivision. The essential purpose of a building permit and a certificate of occupancy for a residential dwelling is to ensure that building code requirements relating to health, safety, and welfare of the residents have been met and that the dwelling is habitable. Section 30-28-203, 12A C.R.S. (1986), states that provisions of the building code, adopted by a board of county commissioners, "shall be made with a reasonable consideration of, and in accordance with, the public health, safety, morals, and general welfare and the safety, protection, and sanitation of such dwellings, buildings, and structures."[13] Building and housing codes, although they may have land use consequences, are not generally treated as land use control devices because the primary purpose of such codes is to address matters of construction and maintenance, not land or the relationship between land and buildings. Donald G. Hagman & Julian C. Juergensmeyer, Urban Planning and Land Development Control Law § 8.1 (2d ed.1986). By the building permit stage all necessary public improvements for the subdivision have been delineated through the agreement approved by the county under section 30-28-137 of the subdivision approval requirements and the county's approval decision.
New York trial and appellate courts have rejected similar attempts to expand upon public improvement agreements executed in connection with approved development. Incorporated Village of Northport v. Guardian Fed. Savings & Loan Ass'n, 87 Misc.2d 344, 384 N.Y.S.2d 923, 926 (N.Y.Sup.Ct.1976). In Northport, the village of Northport approved a subdivision plat and had accepted a bond from the developer for public improvements. The trial court concluded that the village could not then require further exactions in connection with the issuance of certificates of occupancy. Id.; see also Lodico v. Herdman, 44 A.D.2d 556, 352 N.Y.S.2d 510, 512 (1974) (appellate court ruled that the planning board had no authority to reverse itself and require developer to make cash payment in addition to the required performance bond provided by the developer to the town for on-site improvements).
Nor are we presented here with a legislative enactment which provides authority to political subdivisions of the state to charge a school facilities fee in connection with the issuance of a building permit, as a California appellate court addressed in Laguna Village, Inc. v. County of Orange, 166 Cal.App.3d 125, 127-30, 212 Cal.Rptr. 267, 269-70 (1985) (the statute provided that a county may, by ordinance, require dedication, in-lieu fees, or a combination of both for schools as a condition for approval of a development and the payment must be made at the time the building permit is issued). In the absence of such legislation, the rule that we follow here that statutory school-related exactions may not be enlarged upon by a political subdivision has been articulated previously elsewhere. See West Park Ave., Inc. v. Township of Ocean, 48 N.J. 122, 224 A.2d 1, 3 (1966) (building permits or certificates of occupancy unlawfully withheld to obtain payment of $300.00 per house for school board in addition to statutory school site reservation requirement).
The Counties rely in part on section 30-28-107 which recites that, in preparation of a master plan, a consideration is educational opportunity, and, they contend, this justifies imposition of a school impact fee. However, that section is not a substantive grant of authority but, rather, a general statement of purpose to guide development of a master plan.[14] Moreover, this guidance *705 is more suggestive of denial under applicable subdivision regulations where new developments are not accompanied by educational opportunity than it is of authority to impose additional fee exactions in connection with an approved subdivision.
A "master plan is the planning commission's recommendation of the most desirable use of land," Theobald v. Board of County Comm'rs, 644 P.2d 942, 948 (Colo.1982), and serves as a guide to development rather than an instrument to control land use. Id. The overall plan for development and land use of a county is to be "coordinated, adjusted, and harmonious." § 30-28-107. Master plans are advisory in nature, not the equivalent of zoning, "nor binding upon the zoning discretion of the legislative body." Theobald, 644 P.2d at 949.
The Counties argue that the language of section 30-28-133(4), 12A C.R.S. (1986 & 1996 Supp.), stating that subdivision regulations adopted by local governments "shall also include, as a minimum," (emphasis added), the land dedication, or payment of in-lieu fees, implies that "the General Assembly clearly indicated that it was possible to go beyond the minimum." However, the General Assembly, in utilizing the words "as a minimum" in this section was speaking to the overall content of subdivision regulations, which are to include land dedication or in-lieu fees for parks and schools, § 30-28-133(4)(a)(II); sanitary sewer plans and designs, § 30-28-133(4)(c); storm drainage plans, § 30-28-133(4)(b); and standards and procedures for water systems, § 30-28-133(4)(d).
Subdivision approval, based on properly adopted regulations, can include requirements not specifically stated in the statute and may be made to apply prospectively to newly proposed subdivisions. Cf. Beaver Meadows v. Board of County Comm'rs, 709 P.2d 928, 935, 939 (Colo.1985) (land use authority is sufficiently broad to allow county to impose an emergency medical services condition in connection with PUD approval).[15] Here, it is clear, however, that Douglas and Boulder Counties did not enact additional subdivision plan review and approval requirements and apply them prospectively to new subdivision proposals. Rather, the Counties enlarged upon the subdivision exaction by requiring payment of an additional fee at the building permit or certificate of occupancy stage standing apart from their review of the proposed subdivision plan and plat. Moreover, it is impossible to reconcile the Counties' "as a minimum" argument with the legislature's mandate that the school construction fee exaction for an approved subdivision shall "not exceed the market value" of the land that can be required to be dedicated under the provisions of this same statutory section. Since a specific provision prevails over a conflicting general provision, § 2-4-205, 1B C.R.S. (1980), we must construe the specific language of the school exaction requirement as preempting the Counties from exacting an additional fee for the right to build or occupy a home.
In Bethlehem Evangelical Lutheran Church v. City of Lakewood, 626 P.2d 668, 671 (Colo.1981), we upheld a municipal ordinance which tied issuance of a building permit to making or paying for public improvements such as streets, curbs, gutters, sidewalks, and dedication of the necessary public right-of-way, to address increased vehicular and pedestrian traffic generated by the new construction. We determined that the authority for such a requirement was founded in section 31-15-702, 12B C.R.S (1986). We said that:
In view of the statutory scheme that permits the assessment of these property improvement costs to the abutting property, we have no difficulty in holding that *706 when a property owner seeks to put his property to an enlarged use which reasonably necessitates, in the interest of public safety and welfare, the installation of sidewalks, curbs, gutters and street surfacing, a building permit may be conditioned on the construction of such public improvements at the cost of the property owner. We do not find that the imposition of such a condition is unreasonable or a misuse of the police power.
Id. at 672. Thus, in Bethlehem we gave effect, on a municipal level, to the public improvements authority corresponding to provisions of the county subdivision statute pertaining to streets and related facilities. See § 30-28-133(3)(c)(VII), 12A C.R.S. (1986).
We further justified the municipal requirements on a "special benefits" rationale: "that the property is especially benefited by the improvements over and above the general benefit to the public at large." Bethlehem, 626 P.2d at 672. There is no suggestion in Bethlehem that the city could require an additional monetary exaction unrelated to the cost of constructing and maintaining the required roads, sidewalks, curbs, and gutters. To the contrary, Bethlehem carefully distinguished reasonable dedication requirements from unlawful takings without just compensation. Id. at 674 ("It follows that if the Church desires the benefits resulting from the improvement of its property, it must comply with reasonable conditions imposed by the City for dealing with traffic problems caused by that improvement.").
In the present case, the "problem" that the Counties seek to resolve is a shortfall in school district revenue. They have determined that the school dedication or in-lieu fee requirement for approved subdivisions, or combination thereof, authorized to be exacted under the Planning Code is not sufficient for their purposes. But counties have no implied authority to override the express legislative limitation that school related fee exactions shall not exceed the "full market value of such sites and land areas" that the legislature imposed through section 30-28-133(4)(a)(II).
We have upheld fees and assessments based on explicit statutory fee authority. See Zelinger v. City & County of Denver, 724 P.2d 1356, 1359 (Colo.1986); Loup-Miller Constr. Co. v. City & County of Denver, 676 P.2d 1170, 1175-76 (Colo.1984); City of Arvada v. City & County of Denver, 663 P.2d 611, 615 (Colo.1983). No such fee provision is applicable here outside of the subdivision provisions of the Planning Code. Rather, the school district is empowered to make recommendations as to both "school sites" and "school structures." § 30-28-136(2). In turn, by action of the county, "sites" can be obtained through the dedication exaction requirements of section 30-28-133(4)(a). "Structures" can be addressed through public improvement agreements and accompanying contracts and plans under section 30-28-137(1)(b) and sections 22-32-122 and -124, or the in-lieu payment exaction under section 30-28-133(4)(a)(II). If adequate structures do not exist and will not be made available through exercise of the statutory exaction or the public improvement efforts of the developer and/or the school district, denial of the subdivision proposal may result.
We conclude that the General Assembly has both invoked and defined the school exaction requirement attendant to subdivision approval in statutory language that is clear, unambiguous, and definitive. Although a county has authority to fashion subdivision regulations for denial of subdivision approval in circumstances where adequate school opportunity does not or will not exist, the Counties cannot approve a subdivision and enlarge upon the statutory exaction by requiring a second payment at the building permit or certificate of occupancy stage. The General Assembly, under section 30-28-133(4)(a)(II), has prescribed the maximum fee that can be exacted and has prescribed that it be paid by the developer for the subdivision as a whole, not on a lot-by-lot basis by the builder or occupant of a home within the subdivision. Dedication of land within the subdivision, in-lieu payment of market value thereof, or a combination of both, was tailored by the legislature as the maximum exaction that can be required through land use authority for an approved subdivision. A public improvements agreement *707 may be entered into by the developer but county commissioners have no implied power to override the maximum cap placed by the legislature on the amount of the in-lieu payment. The language of section 30-28-133(4)(a)(II)(C) referring to the "growth-related planning functions by school districts for educational purposes," does not authorize Douglas and Boulder County Commissioners to impose the additional fee.

C. Local Government Land Use Control Enabling Act

The Counties also invoke the Local Government Land Use Control Enabling Act of 1974 (the Land Use Act), sections 29-20-101 to -107, 12A C.R.S. (1986 & 1996 Supp.), to support the imposition of school impact fees. According to the legislative declaration of this act, the policy of the state is "to provide for planned and orderly development within Colorado and a balancing of basic human needs of a changing population with legitimate environmental concerns." § 29-20-102, 12A C.R.S. (1986). To this end, the legislature has granted broad authority to local governments to plan for and regulate the use of land within their jurisdictions. § 29-20-102. A county is included in the definition of "local government." § 29-20-103, 12A C.R.S. (1986). Under this statute, a local government may regulate the use of land including: (1) regulating development and activities in hazardous areas; (2) protecting wildlife habitat or species; (3) preserving important historical or archeological areas; (4) regulating the establishment of roads on public lands administered by the federal government; (5) regulating the location of activities and developments which may result in significant changes in population density; (6) phasing development; and (7) regulating land use on the basis of the impact thereof on the community and the surrounding areas. § 29-20-104(1)(a) to (g), 12A C.R.S. (1986).
The Land Use Act was enacted by the General Assembly upon recognition that "rapid growth and uncontrolled development may destroy Colorado's great resource of natural scenic and recreational wealth." Theobald v. Board of County Comm'rs, 644 P.2d 942, 947 (Colo.1982). In cases addressing the Land Use Act, the courts have dealt with governmental balancing of human needs with activities impacting the environment, such as mining, State Bd. of Land Comm'rs v. Mined Land Reclamation Bd., 809 P.2d 974, 979-82 (Colo.1991); oil and gas operations, Voss v. Lundvall Bros., 830 P.2d 1061, 1064-66 (Colo.1992); and the construction of municipal water projects, City of Colorado Springs v. Board of County Comm'rs, 895 P.2d 1105, 1109 (Colo.App.1994).
In contrast, school impact fees are a revenue raising measure for schools and have little to do with protecting natural resources and striking the appropriate balance between natural resource protection and human needs. In Pennobscot, Inc. v. Board of County Commissioners, 642 P.2d 915, 919 (Colo.1982), we held that section 29-20-107, 12A C.R.S. (1986 & 1996 Supp.), of the Land Use Act[16] specifically provides that where other procedural or substantive land use requirements apply they control over the broadly stated powers of the Land Use Act. We consider this to be a codification in land use law of the familiar rule of statutory construction that a specific provision prevails over a more general statement, a principle which is applicable here to aid our statutory construction.

D. Land Development Charges Statute

The Counties contend that "[a]ny doubt as to whether the authority to impose such fees exists is foreclosed by the Land Development Charges statutes," sections 29-1-801 to -804, 12A C.R.S. (1996 Supp.). As recited by its legislative declaration, section 29-1-801, the Development Charges Statute is intended to standardize accounting for the money collected from authorized charges.
In statutory construction we must look to the plain language of the statute. Martin v. Montezuma-Cortez Sch. Dist. RE-1, 841 *708 P.2d 237, 246 (Colo.1992). If there is no ambiguity in the language of a statute, it must be interpreted and applied as written. Deutschendorf v. People, 920 P.2d 53, 60 (Colo.1996).
The Development Charges Statute provides for the method by which the funds are to be deposited and accounted for by the local government, § 29-1-803, 12A C.R.S. (1996 Supp.),[17] in order to standardize, throughout the state, the accounting and reporting requirements for local governments that receive a fee relating to a capital expenditure requirement. The authority to actually impose or assess such fees must be derived from some other statutory source in that no substantive authority for the assessment of fees is conferred by the Development Charges Statute.

E. Planned Unit Development Act of 1972

The Planned Unit Development Act (PUD Act) authorizes the development of a planned unit development which is a unified plan of development as an alternative to traditional zoning requirements. § 24-67-103(3), 10B C.R.S. (1988). The authority delegated to counties and municipalities is to "provide for necessary commercial, recreational, and educational facilities conveniently located to such housing." § 24-67-102(1)(a), 10B C.R.S. (1988).
The PUD Act sets forth standards and conditions pursuant to which the planned unit development plans will be evaluated. § 24-67-105, 10B C.R.S. (1988). This section also provides the authority for a county or municipality to adopt resolutions with respect to permitted uses, the sequence of development according to those uses, the density and intensity of land use, and standards for inclusion of common open space. § 24-67-105(2) to (6). PUD denial may turn on the adequacy of educational facilities because of the reference in section 24-67-102(1)(a), 10B C.R.S. (1988) to educational facilities. Section 24-67-107(4), 10B C.R.S. (1988), requires substantial compliance by counties and municipalities with the subdivision requirements of section 30-28-133. The authority to collect any other fees pursuant to the PUD Act is for the maintenance of the common open space, not for school construction:
(d) The cost of such maintenance by the county or municipality shall be paid by the owners of properties within the planned unit development that have a right of enjoyment of the common open space, and any unpaid assessments shall become a tax lien on said properties.
§ 24-67-105(6)(d). The legislature determined in section 24-67-105(7), 10B C.R.S. (1988), that PUD design, construction and other requirements shall substantially comply with the subdivision provisions of the Planning Code. Thus, the public improvements provisions and school exaction requirement of the Planning Code can be applied by means of a PUD resolution, but an in-lieu fee exaction for an approved PUD cannot exceed the market value of the land dedication set forth in section 30-28-133(4)(a)(II). Once adopted, the PUD plan controls the development of the area and is enforceable. See South Creek Assocs. v. Bixby & Assocs., 781 P.2d 1027, 1034 (Colo.1989).

III.
While the Counties' attempt to expand the statutory school exaction required of subdivision developers to an additional fee payable at issuance of a building permit or certificate of occupancy cannot be sustained, we disapprove of the district courts' determination that the state legislature has acted to preempt the field of school finance. In Board of County Commissioners v. Bowen/Edwards Associates, Inc., 830 P.2d 1045 (Colo.1992), we set forth the standard for preemption analysis as follows:
There are three basic ways by which a state statute can preempt a county ordinance or regulation: first, the express language *709 of the statute may indicate state preemption of all local authority over the subject matter; second, preemption may be inferred if the state statute impliedly evinces a legislative intent to completely occupy a given field by reason of a dominant state interest; and third, a local law may be partially preempted where its operational effect would conflict with the application of the state statute.
Id. at 1056-57 (citations omitted). Both district courts here determined incorrectly that the legislature intended to entirely occupy the field of school finance.
Article IX, section 2 of the Colorado Constitution requires the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state." In ascertaining how the General Assembly has dealt with its school finance function, and whether it has preempted a local government finance role, several statutes are pertinent.

A. The Public School Finance Act

The purpose of the Public School Finance Act of 1994, sections 22-54-101 to -120, 9 C.R.S. (1995 & 1996 Supp.) (the Finance Act),[18] is to further the General Assembly's constitutional duty to provide a thorough and uniform system of public schools throughout the state. The requirement that all school districts operate under the same finance formula implements this duty.
§ 22-54-102(1), 9 C.R.S. (1995).
The finance formula is used to calculate the financial base of public education support for each district. § 22-54-104(1), 9 C.R.S. (1995). This amount represents the "total program" and is used to help fund the costs of providing public education. Id. A district's total program for any budget year, § 22-54-104(2)(a)(I), 9 C.R.S. (1995 & 1996 Supp.), is the greater of either multiplying the number of students enrolled in the school district by the district's per pupil funding allowance, § 22-54-104(2)(a)(I)(A), or $4,305 multiplied by the district funded pupil count, § 22-54-104(2)(a)(III)(B), 9 C.R.S. (1996 Supp.). The district's per pupil funding is determined by either using a statewide base and adjusting it by multiplying several factors that are specific to each district such as personnel costs, cost of living, nonpersonnel costs, district size, and the at-risk student population. § 22-54-104(3), 9 C.R.S. (1995).
Once a district's total program funding is determined by the formula, the Act then dictates which portions of the annual revenue will be provided by the state and which portions will be provided by the local school districts. § 22-54-106, 9 C.R.S. (1995 & 1996 Supp.). The local school district share is determined by the property tax revenue from the mill levy[19] and the amount of specific ownership tax revenue received by the district. § 22-54-106(1)(a)(I).
The Finance Act also mandates that "equity considerations dictate that all districts be subject to the expenditure and maximum levy provisions of this article." § 22-54-102(1). In order to achieve this end, the statute requires that every school district shall budget certain minimum amounts to be allocated to specified purposes. § 22-54-105(1)(a), 9 C.R.S. (1995). These purposes include instructional supplies and materials, § 22-54-105(1)(c), 9 C.R.S. (1995 & 1996 Supp.), instructional capital outlay, § 22-54-105(1)(d), 9 C.R.S. (1995), the capital reserve fund, the insurance reserve fund, or funds for the management of risk-related activities, § 22-54-105(2)(a), 9 C.R.S. (1995).
The Finance Act allows a district to raise and expend property tax revenues in excess of the district's total program, if the issue is presented to the electors of the district as to whether the district should be authorized to raise and expend additional property tax revenues. *710 § 22-54-108, 9 C.R.S. (1995 & 1996 Supp.).

B. Accelerated Property Taxes

Both the Douglas County and the Boulder County District Courts identified section 39-5-132, 16B C.R.S. (1994 & 1996 Supp.), as an additional indication that the General Assembly intended to completely occupy the field of public school finance.
This section deals with the assessment and taxation of new construction, and it allows a board of county commissioners to determine the extent of growth within the county and to make a finding of severe growth impact. § 39-5-132(2)(a)(I)(A). Such a finding, which can only be made under specified conditions, would then allow a county to accelerate property taxes on new construction.
The legislative finding leading to this provision is that "it is a matter of statewide concern that revenues from property taxes on newly constructed buildings may need to be put to special use in order to accommodate the capital needs resulting from such new construction, especially to accommodate the capital needs of the public schools in this state." § 39-5-132(1).
The revenues received by a school district pursuant to the accelerated property tax are then deposited in the district's general fund. § 39-5-132(5). These moneys are not calculated into the amount of revenue which a district is entitled to receive from the property tax levy for the district's general fund pursuant to the School Finance Act of 1994. Id.
The accounting and reporting statute, sections 22-45-101 to -113, 9 C.R.S. (1995 & 1996 Supp.), directs the manner in which the school districts keep financial records. Several different funds are created for various purposes and expenditures from each fund are limited to the specific purposes of the fund.
The general fund includes all revenues, except those attributable to the bond redemption fund, the capital reserve fund, the special buildings fund, or the insurance reserve fund. § 22-45-103(1)(a)(I), 9 C.R.S. (1995). The expenditures from this fund are limited to instructional supplies and materials, and instructional capital outlay. § 22-45-103(1)(a)(II), 9 C.R.S. (1995).
The bond redemption fund includes the revenues from taxes levied for the purpose of satisfying bonded indebtedness obligations. § 22-45-103(1)(b)(I), 9 C.R.S. (1995). These revenues may only be used for the purpose of obtaining or using real property or equipment for school buildings, sites, or structures. § 22-45-103(1)(b)(II), 9 C.R.S. (1995).
The capital reserve fund, § 22-45-103(1)(c)(I), 9 C.R.S. (1995), includes all transfers made from the general fund, and the revenues received pursuant to the accelerated property tax provisions in section 39-5-132. These revenues may be supplemented by gifts, donations, and tuition receipts. § 22-45-103(1)(c)(I). Expenditure from this fund is limited to long-term capital outlays including the acquisition of land or improvements and construction of structures thereon; construction of additions to existing structures; procurement of equipment for new buildings; alterations or improvements to existing structures; the acquisition of school buses; and installment purchase agreements or lease agreements with an option to purchase. § 22-45-103(1)(c)(I)(A)-(F), 9 C.R.S. (1995).
The special building fund includes revenues from the tax levy for the purpose of school construction. Expenditures from this fund are limited to the acquisition of land and construction of structures thereon. § 22-45-103(1)(d)(I), 9 C.R.S. (1995).

C. Preemption Analysis

Express preemption arises when the express language of the statute indicates the state's intent to preempt all local authority over the given subject matter. Board of County Comm'rs v. Bowen/Edwards Assocs., Inc., 830 P.2d 1045, 1056 (Colo.1992) (citing Brubaker v. Board of County Comm'rs, 652 P.2d 1050, 1055 (Colo.1982)). We may expect, when preemption applies, that the legislature will have provided a clear and unequivocal statement of intent to prohibit the exercise of local government authority in *711 matters of shared state and local interest. Bowen/Edwards, 830 P.2d at 1057.
Although we have no specific instance of local government school financing which is ripe for appeal and decision here, other than school impact fees asserted under land use authority, we find no clear and unequivocal statement of legislative intent to exclude a local government role in school finance matters. To the contrary, the legislative declaration of the Finance Act states that "the adoption of such formula in no way represents a commitment on the part of the general assembly concerning the level of total funding for schools for the 1995-96 budget year or any budget year thereafter." § 22-54-102(2), 9 C.R.S. (1995) (emphasis added). The Finance Act controls only how the state equalization money, including both state funds and local property tax revenues, is to be raised and expended.
The Accelerated Property Tax provisions, section 39-5-132, expand on one method by which a local government may raise revenues for schools. This section contains no language indicating a legislative intent that this is the exclusive method available to counties or school districts to address growth-related educational needs.
The accounting and reporting statute deals with the accounting methodology to be used by all school districts. It mandates the creation of several distinct funds to be used for specific purposes within the school district. The general intent of the statute is to maintain financial transaction records of the school district regarding appropriations, revenues, and expenditures. § 22-45-102(1), 9 C.R.S (1995).
These statutes collectively relate to state equalization moneys and local ad valorem property taxes, but they do not in any way limit counties or school districts from using other authorized sources of revenue which they could make available to schools.
The determination of whether the legislature intended to completely occupy a given field to the exclusion of all other regulation "must be measured not only by `the language used but by the whole purpose and scope of the legislative scheme,' including the particular circumstances upon which the statute was intended to operate." Bowen/Edwards, 830 P.2d at 1058 (quoting City of Golden v. Ford, 141 Colo. 472, 478, 348 P.2d 951, 954 (1960)).
The state has an interest in providing a thorough and uniform system of free public school education throughout the state. The Finance Act and the other related statutory provisions help the state achieve its goal of fostering equity among the state's many school districts. Clearly, this goal is of statewide importance because ad valorem property taxes in different counties are not equal, and thus the General Assembly must supplement those revenues with state equalization funds in order to accomplish its constitutional mandate. Local governments have a clear and direct interest in providing educational opportunity for the residents they serve.
The respective interests of both the state and the county are not "so irreconcilably in conflict, as to eliminate by necessary implication any prospect for a harmonious application of both regulatory schemes." Bowen/Edwards, 830 P.2d at 1058. To the contrary, the interests of state and local governments in the educational welfare of Colorado citizens are similar. Counties and school districts also have an important interest in ensuring that the needs of the student population in their districts are met. Historically, local property taxes and the state financial contributions have been the main components in school finance combining local and state resources and demonstrating an intended mix of state and local funding. Lujan v. Colorado State Bd. of Educ., 649 P.2d 1005, 1011 (Colo.1982). The state's interest in providing a thorough and uniform system of public school education is not so obviously dominant over the local government interest so as to preclude appropriate local government sources of financial assistance.
Moreover, it is clear that the Finance Act does not provide adequate revenues for school construction. By the early 1990's, Douglas County had incurred more than eighty million dollars in bonded indebtedness for school related purposes. The General Assembly has not demonstrated its intent *712 that the bonding mechanism is the exclusive method of funding available to counties or school districts. Douglas County is expected to reach its bonded indebtedness limit in the next five years, an indication that the capability to bond is limited.
In other ways, the General Assembly has indicated an intent not to preempt the arena of school finance. Pursuant to section 22-44-204, 9 C.R.S. (1995), every school district must use the Financial Policies and Procedures Handbook, developed by the State Board of Education, in developing a budget for the district, in keeping financial records, and in the presentation of financial information to the local boards of education. § 22-44-204(3). This handbook, in describing how revenues should be projected in setting a budget for a district, lists the following sources: revenues from the Finance Act; ownership tax revenues; state program funds; federal grants; other local sources such as interest income, tuition funds, donations, community use fees, revenue from the sale of property, student participation fees and gate receipts from school sponsored activities, and rental income. Colo. Dep't. of Education, Financial Policies and Procedures Handbook D-7 to D-9 (1992). Thus, the General Assembly has contemplated that local sources of revenue may supplement the Finance Act funds.
Preemption may also arise due to operational conflict when the effectuation of a local interest would materially impede or destroy the state interest. As discussed above, we conclude that the state and local interests involved in public education and growth-related planning are not irreconcilably conflicting.
In order for a conflict to exist, both the state statute and the local resolution or ordinance must contain express or implied conditions which are inconsistent and irreconcilable with one another. C & M Sand & Gravel v. Board of County Comm'rs, 673 P.2d 1013, 1016 (Colo.App.1983). If there is no such conflict, the authority of the empowered state and local entities is to be given effect. Id.; see also Voss v. Lundvall Bros., 830 P.2d 1061, 1066 (Colo.1992).
Here, there is no irreconcilable conflict. The purpose and operation of the Finance Act and related statutes can be achieved without excluding a local government role if the local funding is from an authorized source and serves to supplement those funds otherwise available to the public schools.
An amendment to the Finance Act explicitly recognizes a local government and school district role in funding, constructing, maintaining, and managing capital construction projects. Local governments and school districts may cooperate to fund, construct, maintain, or manage capital construction projects "as long as funding for such projects is provided solely from a source of local government revenue that is otherwise authorized by law." § 22-54-102(3)(a), 9 C.R.S. (1996 Supp.). We conclude that the 1996 amendment to the Finance Act, whereby the General Assembly recognized that authorized local sources of revenue may be used to fund capital construction projects, constitutes a clarification of existing law rather than a modification thereof and is entitled to be given effect. Cf. Colorado Ground Water Comm'n v. Eagle Peak Farms, Ltd., 919 P.2d 212, 218 n. 5 (Colo.1996).
Moreover, the Finance Act amendment clearly anticipates that voluntary contributions may be made for the benefit of the schools, either through an enforceable agreement entered into before July 1, 1996, § 22-54-102(3)(b)(II), 9 C.R.S. (1996 Supp.),[20] or with a contribution to be made before December 31, 1997, § 22-54-102(3)(b)(I), 9 C.R.S. (1996 Supp.).[21] The voluntary agreement *713 and the contributions referred to in section 22-54-102(3)(b)(I) to (II), are distinct from public improvement agreements, in that, by this 1996 amendment to the Finance Act, the General Assembly addressed its intention with regard to the disposition of impact fees depending on the outcome of this appeal. It provided that, whatever the outcome, agreements to pay the impact fee and decisions to contribute any refund that otherwise might be owed would inure to the benefit of the schools. Public improvements agreements, the statutory authority in connection therewith, and the county commission's authority to approve or deny subdivision proposals are unaffected by the 1996 amendment whose purpose was to address the additional school impact fees. Independent of this provision, gifts, donations, or grants to school districts may be made and received pursuant to conditions prescribed by donors. § 22-32-110(1)(y), 9 C.R.S. (1995).
Our holding in this case prohibiting county enlargement of the statutorily prescribed school exaction in connection with approved subdivisions does not prevent the making of school construction or other school-related contributions at any time. Working with local governments and school districts in a joint effort to enhance educational opportunity for residents is entirely germane to the well being of communities the builders bring into being.
On remand, the district courts for Douglas and Boulder Counties should reflect, in their orders for judgment and permanent injunction, that voluntary agreements to pay school impact fees entered into before July 1, 1996, are to be enforced and funds therefrom may be collected for the term of the agreement and voluntary contributions may be made and collected through 1997 as provided in section 22-54-102(3)(b)(II);[22] further, that refunds otherwise owing may be retained and expended for the benefit of the schools if those entitled to refunds choose instead to make voluntary contributions to be remitted to the school district at any time under the authority of section 22-32-110(1)(y).

IV.
Accordingly, we affirm the judgments of the district courts in holding that Douglas and Boulder Counties could not impose or exact a school impact fee at the time of issuance of a building permit or certificate of occupancy in addition to that provided by section 30-28-133(4)(a)(II). We reverse the district courts' ruling that the General Assembly has preempted the field of public school finance. We remand with directions that the judgment and permanent injunctions of the district courts shall be modified to require refund of the collected additional impact fees to those who elect to take the refund and have not either entered into an agreement which is enforceable under section 22-54-102(3)(b)(II), or do not wish to make a voluntary contribution of such refund under section 22-54-102(3)(b)(I) or section 22-32-110(1)(y).[23] We remand for further proceedings consistent with this opinion.
VOLLACK, C.J., dissents, and LOHR and MULLARKEY, JJ., join in the dissent.
*714 Chief Justice VOLLACK dissenting:
The majority holds that Boulder County and Douglas County (the counties) may not exact an impact fee to pay for school facilities because the imposition of such a fee is unauthorized under section 30-28-133(4)(a), 12A C.R.S. (1986). The majority also holds that the state has not preempted the field of public school finance. In my view, the counties were authorized to assess an impact fee to pay for school structures under the County Planning Code, sections 30-28-101 to -209, 12A C.R.S. (1986), prior to an amendment to the Public Schools Finance Act of 1994, which explicitly prohibits such fees. § 22-54-102(3)(a), 9 C.R.S. (1996 Supp.). For this reason, I dissent from that part of the majority's opinion which holds that the counties were unauthorized to assess impact fees during this period.

I.

A.

Population Growth
Between 1980 and 1990, Douglas County experienced a 140% increase in population, making it the second fastest growing county in the nation. Analysts predicted that the population of Douglas County would increase from 60,390 in 1990 to 95,000 by the year 2000; however, Douglas County actually reached that figure by 1995. Similarly, Boulder County issued 966 building permits for new homes in the Niwot area between 1983 and 1993. As a result of this tremendous growth, schools in the counties became overcrowded.
In Douglas County, Bear Canyon Elementary School opened in 1990 and reached its capacity by 1992. Eagle Ridge Elementary School opened in 1989, reached its capacity of 520 students in 1992, and expected more than twice that many students to reside within the school's attendance area by 1995. Both Highlands Ranch Senior High School and Ponderosa High School were expected to be significantly over capacity by 1996. In Boulder County, Niwot Elementary School was expected to be at least 170 students over capacity in 1995. Sunset Middle School was expected to be 92 students over capacity by 1995.
It is within this historical context that the counties developed impact fees as a means of ensuring that development would bear a proportionate share of the capital costs necessary to build new schools in responding to rapid population growth and school overcrowding.

B.

The Impact Fee[1]
The impact fees were assessed on a scale depending upon the size of the residential unit and whether the residence was a multifamily or single-family dwelling.[2] After deducting two percent to pay for county administrative costs, the school districts were authorized to place the collected fees in a trust fund that was to be used solely to acquire, construct, or expand school educational facilities. These new facilities were required to serve the residences that paid the impact fees. Funds that were not used for these purposes were refunded. Credits against impact fees could be obtained through private construction of school facilities. The following were exempt from payment of the impact fee: (1) alterations of existing buildings; (2) construction of accessory buildings; (3) replacement of destroyed buildings; (4) non-residential buildings; and (5) elderly housing.
The submission of annual reports was required to review and reconsider: (1) the data upon which the methodology was based; (2) alternative revenue sources; (3) statutory *715 changes; (4) capacity enhancement policies; and (5) other growth-related factors. Finally, an accounting and audit procedure was developed to keep track of the school impact fees collected and expended.

II.

A.
Counties possess only those powers expressly delegated to them by the Colorado Constitution or by statute. Board of County Comm'rs v. Bowen/Edwards Assocs., 830 P.2d 1045, 1055 (Colo.1992). However, counties also possess such incidental implied powers as are reasonably necessary to carry out their express powers. Bowen/Edwards, 830 P.2d at 1055 (citing Board of County Comm'rs v. Love, 172 Colo. 121, 125, 470 P.2d 861, 861 (1970)).
It is within the police power of the state to require that developers assume the burden of funding reasonable improvements to public facilities made necessary by a development as a condition of approval of that development. Beaver Meadows v. Board of County Comm'rs, 709 P.2d 928, 935 (Colo.1985). The state may delegate this authority to its political subdivisions using broad and general language. Beaver Meadows, 709 P.2d at 935-36.
Challenges to statutory delegations of authority are seldom sustained. Cottrell v. City and County of Denver, 636 P.2d 703, 708 (Colo.1981). When counties are authorized to adopt regulations by statute, the regulations must be rationally and clearly encompassed by the statutory delegation. See Beaver Meadows, 709 P.2d at 939 n. 7. Finally, the regulations must contain sufficient statutory standards and safeguards at the statutory and local level to protect against the unnecessary and uncontrolled exercise of discretionary power. Id. at 936; Cottrell, 636 P.2d at 709.

B.
In holding that the counties were unauthorized to assess impact fees to fund the construction of school facilities, the majority relied heavily upon its interpretation of the County Planning Code, and specifically section 30-28-133(4), 12A C.R.S. (1986 & 1996 Supp.).
In construing a statute, courts must look to the language of the statute, giving effect to each word and phrase using commonly accepted meanings. PDM Molding, Inc. v. Stanberg, 898 P.2d 542, 545 (Colo.1995); Florence v. Board of Waterworks, 793 P.2d 148, 151 (Colo.1990). Words are presumed to be used in their familiar and popular sense without any forced or technical construction to limit or extend their meaning. Colorado Fuel & Iron Corp. v. Industrial Comm'n, 152 Colo. 256, 260, 381 P.2d 267, 269 (1963). If the statutory language is unambiguous, a court need not resort to interpretive rules of statutory construction. PDM Molding, 898 P.2d at 545.
Section 30-28-133(4) provides in pertinent part:
Subdivision regulations adopted by the board of county commissioners pursuant to this section shall also include, as a minimum, provisions governing the following matters:
(a) Sites and land areas for schools and parks when such are reasonably necessary to serve the proposed subdivision and the future residents thereof.
....
(b) Standards and technical procedures applicable to storm drainage plans ...;
(c) Standards and technical procedures applicable to sanitary sewer plans and designs...;
(d) Standards and technical procedures applicable to water systems.

(Emphasis added.) The majority posits that the "as a minimum" language of section 30-28-133(4) does not authorize county imposition of a regulatory impact fee because the General Assembly has defined the extent of county regulatory authority to levy school exactions in section 30-28-133(4)(a), 12A C.R.S. (1986 & 1996 Supp.).[3] Maj. op. at *716 705-706. Under the majority's reasoning, the specific limitations on county exactions for schools in section 30-28-133(4)(a) renders the general "as a minimum" language in section 30-28-133(4) inapplicable as authorization for further fee exactions to pay for schools.
The plain language of section 30-28-133(4) requires that counties adopt regulations addressing: (a) county acquisition of sites and land areas for schools; (b) standards and technical procedures for storm drainage plans; (c) standards and technical procedures for sanitary sewer plans; and (d) standards and technical procedures for water systems. The statute requires counties to adopt regulations that cover these four crucial aspects of development as a minimum. There is nothing ambiguous in the statute. The "as a minimum" language qualifies section 30-28-133(4) as a whole and without exception, which indicates that the General Assembly intended to have the "as a minimum" language predominate over the language of section 30-28-133(4)(a).[4]
The majority mischaracterizes section 30-28-133(4)(a) as an explicit limitation on county power to exact fees for schools. In no way does section 30-28-133(4)(a), which addresses the sites and land areas that may be set aside for schools by reservation, dedication, or payment in lieu thereof, limit county regulatory power to exact fees for the erection of buildings and structures. Therefore, section 30-28-133(4)(a) does not explicitly prohibit a county from assessing an impact fee to pay for school buildings. See Pennobscot, Inc. v. Board of County Comm'rs, 642 P.2d 915, 918-19 (Colo.1982) (holding that county was unauthorized to adopt subdivision regulations concerning land divisions of greater than thirty-five acre tracts when statutory provision specifically exempted these tracts from subdivision regulation).
For these reasons, the counties were authorized to adopt additional regulations to fund school structures beyond the minimum regulatory requirements of section 30-28-133(4) so long as the regulations were rationally and clearly encompassed by the statutory delegation. See Beaver Meadows, 709 P.2d at 938-39.
Educational values pervade the County Planning Code. See § 30-28-107, 12A C.R.S. (1986); § 30-28-133(4)(a); § 30-28-133(4.3), 12A C.R.S. (1986 § 1996 Supp.); § 30-28-136(1)(a), 12A C.R.S. (1986); § 30-28-136(2), 12A C.R.S. (1986 & 1996 Supp.). These statutory delegations include county authority to *717 weigh the adequacy of existing school structures. See § 30-28-136(2). Similarly, the regulations encompassing the impact fees include standards designed to ensure that the fees are not assessed arbitrarily. See Cottrell, 636 P.2d at 710.[5] The impact fee regulations are statutorily authorized and ensure consistent and fair application. Therefore, the counties' adoption of impact fees by regulation does not violate non-delegation principles. Beaver Meadows, 709 P.2d at 938-39; Cottrell, 636 P.2d at 708-10.

C.
There is further support in the County Planning Code for the counties' imposition of an impact fee.
Before a county may approve or deny a subdivision plan, section 30-28-136(1)(a) requires the county to distribute copies of the subdivision plans to school districts for their review and recommendation. Section 30-26-136(2) requires that the school district provide the county with a recommendation on the adequacy of existing school sites and structures. As the majority repeatedly points out, the county may then deny subdivision approval based upon the school district's recommendations. Maj. op. at 701, 703, 706; see also Shoptaugh v. Board of County Comm'rs, 37 Colo.App. 39, 42, 543 P.2d 524, 527-28 (1975).
It follows that if the counties hold the greater power to deny subdivision approval due to inadequate school structures, they must also hold the lesser power to condition their approval on the payment of a fee to fund school construction. See Nollan v. California Coastal Comm'n, 483 U.S. 825, 836-37, 107 S.Ct. 3141, 3148-49, 97 L.Ed.2d 677 (1987); see also Beaver Meadows, 709 P.2d at 939 (finding that county was authorized to impose emergency medical services condition before it approved planned unit development); Underhill v. Board of County Comm'rs, 39 Colo.App. 185, 187, 562 P.2d 1125, 1126 (1977) (holding that Board of County Commissioners could deny subdivision plat approval for a failure to comply with conditions imposed by the Planning Commission). Similarly, if counties are authorized to adopt subdivision regulations to assess an impact fee, as this dissent suggests, they also hold the authority to deny issuing a building permit before that fee is paid. § 30-28-110(4)(a), 12A C.R.S. (1986); see also Bethlehem Evangelical Lutheran Church v. City of Lakewood, 626 P.2d 668, 672 (Colo.1981).

D.
The majority implies that the counties had the opportunity to obtain funding for school structures through the use of subdivision improvement agreements negotiated prior to subdivision approval. Maj. op. at 701-703. These agreements are defined in section 30-28-101(11), 12A C.R.S. (1986), as
one or more security arrangements which a county shall accept to secure the actual cost of construction of such public improvements as are required by county subdivision regulations within the subdivision.

(Emphasis added.)
The definition refers to subdivision improvement agreements as security arrangements concerning improvements that are "required by the county subdivision regulations." Because the majority holds today that counties are unauthorized to promulgate regulations in addition to reservations, dedications, or payments in lieu thereof, the counties are foreclosed, by definition, from relying upon subdivision improvement agreements to obtain adequate funding for school structures.[6] Therefore, subdivision improvement *718 agreements have never offered the county a viable alternative.
Furthermore, the definition requires that improvements fall "within the subdivision." Clearly, requiring that improvements fall within the subdivision refers to streets, sidewalks, curbs, and other improvements that will specifically benefit the subdivision. See maj. op. at 705 n. 15; Bethlehem Evangelical Lutheran Church, 626 P.2d at 672. These improvements could not reasonably include a school unless the proposed subdivision was of such magnitude that it could sustain its own school.

III.
I do not believe that the County Planning Code contains a specific limitation on the counties' ability to impose an impact fee, by regulation, to raise capital for the construction of school buildings and facilities. Section 30-28-133(4)(a) refers to acquisition of land or payments in lieu thereof, and does not address funding for buildings or structures. Therefore, the minimum requirements of section 30-28-133(4) do not foreclose the counties' additional authority to enact regulations in furtherance of the County Planning Code's educational ideals.
For this reason, I would reverse both district court rulings and hold that the counties were authorized to assess an impact fee up until the amendment prohibiting such fees.
I am authorized to say that Justice LOHR and Justice MULLARKEY join in this dissent.
NOTES
[1] The issues for which we granted certiorari were stated as follows: whether a county, as a condition for issuing a building permit for a new home, may impose an impact fee to pay part of the school buildings needed to serve that home; whether the state statutes regulating school financing and state equalization funds preempt a county from imposing a school impact fee, and; whether a county school impact fee constitutes a valid regulatory fee.
[2] An amendment to the Public School Finance Act of 1994 prohibits local governments or school districts from using impact fees or other similar development charges to fund capital projects or other facilities. Section 22-54-102(3)(a), 9 C.R.S. (1996 Supp.), provides in pertinent part that:

Nothing in this article shall be construed to prohibit local governments from cooperating with school districts through intergovernmental agreements to fund, construct, maintain, or manage capital construction projects or other facilities ... as long as funding for such projects is provided solely from a source of local government revenue that is otherwise authorized by law except impact fees or other similar development charges or fees.
(Emphasis added.) Thus, these appeals concern fees assessed between 1992 and 1996.
[3] In addition, concerns were raised by individuals who own vacant lots and have paid property taxes that have been used to retire debt to construct schools but who have clearly not benefited from the tax payments. The Roxborough Park Foundation, for example, representing nearly 577 owners of parcels of land, pointed out that vacant lot owners at Roxborough have paid more than $3,000,000 in school property taxes in the last ten years, while creating no school impact. They argued that it is unfair to then require payment of the impact fee upon the decision to build on that lot. The response to this concern stated in part that "[l]eaving a lot vacant over time is a matter of choice, and the owner must be aware that utility tap fees, tax rates, building codes and related items will change over time and likely increase."
[4] Section 6 of the Board of County Commissioners of Douglas County, Resolution R-992-062 (July 22, 1992), provides that the amount of the school impact fee shall be determined in accordance with a fee schedule. The fee schedule then attaches a price per square foot for single family residences and for attached/multifamily residences, and a price per unit for residences over 4,201 square feet. The schedule sets forth the following fees:

Size of Residence Single Family Attached/Multi-
(square feet) Family
----------------- ------------- ---------------
0 to 900 $0.42/sq. ft. $ 0.10/sq. ft.
901 to 1,200 0.62 0.15
1,201 to 4,200 0.83 0.20
4,201 and larger $3,486/unit $819.00/unit

[5] HBA was subsequently dismissed for lack of standing.
[6] The builders asserted the following claims: (1) ultra vires; (2) state preemption of any county authority from adopting school impact fees; (3) abuse of discretion in adopting the fees; (4) violation of Colo. Const. art. IX, § 2, which provides for a thorough and uniform system of free public schools; (5) violation of Colo. Const. art. X, § 3, mandating uniform property taxation; (6) unlawful taking of property without just compensation in violation of Colo. Const. art. II, § 15, and U.S. Const. amend. V; and (7) violation of the due process and equal protection provisions of the Colo. Const. art. II, § 25, and the U.S. Const. amend. XIV.
[7] The court did not address any of the remaining claims.
[8] The order was subsequently amended to exclude those parties who had agreed to waive and release all claims to school impact fee refunds, in accordance with a Douglas County School Facilities Trust Fund Participation Agreement, from receiving a refund.
[9] The land dedication requirements of the statute are set forth in the subdivision regulations section which provide that:

(4) Subdivision regulations adopted by the board of county commissioners pursuant to this section shall also include, as a minimum, provisions governing the following matters:
(a) Sites and land areas for schools and parks when such are reasonably necessary to serve the proposed subdivision and the future residents thereof. Such provisions may include:
(I) Reservation of such sites and land areas, for acquisition by the county;
(II) Dedication of such sites and land areas to the county or to the public or, in lieu thereof, payment of a sum of money not exceeding the full market value of such sites and land areas or a combination of such dedication and such payment; except that the value of such combination shall not exceed the full market value of such sites and land areas. If such sites and land areas are dedicated to the county or the public, the board of county commissioners may, at the request of the affected entity, sell the land. Any such sums, when required, or moneys paid to the board of county commissioners from the sale of such dedicated sites and land areas shall be held by the board of county commissioners:
(A) For the acquisition of reasonably necessary sites and land areas or for other capital outlay purposes for schools or parks;
(B) For the development of said sites and land areas for park purposes; or
(C) For growth-related planning functions by school districts for educational purposes.
(III) Dedication of such sites and land areas for the use and benefit of the owners and future owners in the proposed subdivision.
§ 30-28-133(4), (4)(a), (4)(a)(I) to (III) (emphasis added).
[10] This provision states that

After final approval of a subdivision plan or plat and receipt of dedications of sites and land areas or payments in lieu thereof required pursuant to subparagraph (II) of paragraph (a) of subsection (4) of this section, the board of county commissioners shall give written notification to the appropriate school districts and local government entities. Following such notice, a school district or local government entity may request and shall demonstrate to the board of county commissioners a need for land or moneys for a use authorized by subparagraph (II) of paragraph (a) of subsection (4) of this section. When a board of county commissioners votes to allocate land or moneys for subject project, such land or moneys shall immediately be transferred to the appropriate school district or local government entity.
§ 30-28-133(4.3). [ (Emphasis added).]
[11] In 1996, the General Assembly provided further clarification and detail to the land dedication and fee payment provisions. These provisions now read as follows:

After final approval of a subdivision plan or plat and receipt of dedications of sites and land areas or payments in lieu thereof required pursuant to subparagraph (II) of paragraph (a) of subsection (4) of this section, the board of county commissioners shall give written notification to the appropriate school districts and local government entities. Following such notice, a school district or local government entity may request periodic transfer on no longer than an annual basis of such land or moneys to the district or entity. When a board of county commissioners determines that the school district or local government entity has demonstrated a need for the land or moneys based on a long-range capital plan or evidence of the impact of the subdivision on the district or entity, or both, it shall periodically transfer on no longer than an annual basis the land or moneys to the appropriate school district or local government entity. The district or entity shall use the transferred land or moneys only for a purpose authorized by sub-subparagraphs (A) to (C) of subparagraph (II) of paragraph (a) of subsection (4) of this section. Any moneys received by the board of county commissioners that are transferred pursuant to this subsection (4.3) are not county revenues for purposes of paragraph (d) of subsection (7) of section 20 of article X of the state constitution.
§ 30-28-133(4.3), 12A C.R.S. (1996 Supp.).
[12] Ch. 235, sec. 1, § 30-28-133(4)(a)(II), 1984 Colo. Sess. Laws 826.
[13] The Uniform Building Code, with which a county's building code must be consistent, § 30-28-201(1), 12A C.R.S. (1996 Supp.), states, in pertinent part, that its purpose is to "provide minimum standards to safeguard life or limb, health, property and public welfare by regulating and controlling the design, construction, quality of materials, use and occupancy, location and maintenance of all buildings." Uniform Building Code § 102 (1988).
[14] The statutory provision actually provides that the various land uses designated in the plan should tend to

create conditions favorable to health, safety, energy conservation, transportation, prosperity, civic activities, and recreational, educational, and cultural opportunities; will tend to reduce the wastes of physical, financial, or human resources which result from either excessive congestion or excessive scattering of population; and will tend toward an efficient and economic utilization, conservation, and production of the supply of food and water and of drainage, sanitary, and other facilities and resources.
§ 30-28-107. Clearly, educational opportunity is but one of the many factors to consider in land use planning and designation under this provision.
[15] Reasonable improvements to public facilities may include, for example, emergency medical services, access roads to the development, Beaver Meadows, 709 P.2d at 938-39, or sidewalks, curbs, gutters, or street paving, Bethlehem Evangelical Lutheran Church v. City of Lakewood, 626 P.2d 668, 672-73 (Colo.1981).
[16] Section 29-20-107, 12A C.R.S. (1986), states that:

Where other procedural or substantive requirements for the planning for or regulation of the use of land are provided by law, such requirements shall control.
[17] This section provides in pertinent part:

Except as otherwise provided in this section, all moneys from land development charges collected... shall be deposited or, if collected for another local government, transmitted for deposit, in an interest-bearing account which clearly identifies the category, account, or fund of capital expenditure for which such charge was imposed.
§ 29-1-803(1), 12A C.R.S. (1996 Supp.).
[18] The Public School Finance Act of 1988, §§ 22-53-101 to -208, 9 C.R.S. (1988), was amended in 1994, and relocated to §§ 22-54-101 to -120, 9 C.R.S. (1995 & 1996 Supp.). The 1988 Act was in effect at the time that the resolutions were adopted. There are some elements of the funding formulas that differ, but the two Acts are similar in their purpose. For purposes of this analysis, only the 1994 Act will be discussed.
[19] "A mill is a monetary unit frequently used in taxation which has the value of one-tenth of a cent." Lujan v. Colorado State Bd. of Educ., 649 P.2d 1005, 1012 n. 4 (Colo.1982).
[20] The amendment provides in pertinent part that

[i]f a decision of the supreme court rejects the right to impose such fees or charges, such local government may impose and collect such fees and charges in connection with or as required by a voluntary agreement entered into before July 1, 1996, for the term of the agreement.
§ 22-54-102(3)(b)(II).
[21] This provision states in pertinent part that nothing in this subsection shall be construed to:

Limit or restrict a county's power to require the reservation or dedication of sites and land areas for schools or the payment of moneys in lieu thereof ... or to limit a local government's ability to accept and expend impact fees or other similar development charges or fees contributed voluntarily on or before December 31, 1997.
§ 22-54-102(3)(b)(I), 9 C.R.S. (1996 Supp.).
[22] The Douglas County Board of County Commissioners moved to modify the permanent injunction to reflect that three of the plaintiffs in the action below were parties to participation agreements with Douglas County, the school district, and the Douglas County School Facilities Trust Fund Foundation. Under those agreements, the plaintiffs have expressly waived and released any claims to refunds of school impact fees paid, regardless of the outcome of this litigation. Falcon Development Group, Inc., d/b/a Falcon Homes, The Writer Corporation, and Virden Homes, Inc. participated in the trust fund agreements. The participation agreements will remain in effect until $5 million has been contributed by all of the eighteen participating homebuilders. The three participating parties will not have a right to a refund until that level of participation is met.
[23] We are not called upon in this appeal to determine either the identity of or the amount owed to developers, builders, homeowners, or other persons who may be entitled to receive a refund of collected impact fees which are not contributed for the benefit of the schools under one or more of these statutory provisions.
[1] The impact fees described herein refer to those assessed by Douglas County. The Boulder County impact fees are substantially similar although not as detailed.
[2] In Douglas County, the impact fee for single-family dwellings ranged from $.42 to $.83 per square foot depending upon the overall square footage of the residence, and was capped at $3,486 for single-family dwellings of more than 4,201 square feet. In Boulder County, a $1,910 fee was assessed on new dwellings in the Niwot Elementary School attendance area and a $1,086 fee was assessed on new dwellings in the Sunset Middle School attendance area.
[3] Section 30-28-133(4)(a) additionally provides the following for regulations addressing sites and land areas:

Such provisions may include:
(I) Reservation of such sites and land areas, for acquisition by the county;
(II) Dedication of such sites and land areas to the county or to the public or, in lieu thereof, payment of a sum of money not exceeding the full market value of such sites and land areas or a combination of such dedication and such payment; except that the value of such combination shall not exceed the full market value of such sites and land areas. If such sites and land areas are dedicated to the county or the public, the board of county commissioners may, at the request of the affected entity, sell the land. Any such sums, when required, or moneys paid to the board of county commissioners from the sale of such dedicated sites and land areas shall be held by the board of county commissioners:
(A) For the acquisition of reasonably necessary sites and land areas or for other capital outlay purposes for schools or parks;
(B) For the development of said sites and land areas for park purposes; or
(C) For growth-related planning functions by school districts for educational purposes.
(III) Dedication of such sites and land areas for the use and benefit of the owners and future owners in the proposed subdivision.
(Emphasis added.)
[4] I disagree with the majority's blanket statement that specific statutory provisions prevail over conflicting general provisions. Maj. op. at 705. Section 2-4-205, 1B C.R.S. (1980), provides:

If a general provision conflicts with a special or local provision, it shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.
Giving effect to both provisions would authorize counties to accept an in lieu of payment for school property and assess an impact fee to construct school buildings on that property. It is therefore quite possible to construe these two statutes in harmony before having to discard one. See Fuhrer v. Department of Motor Vehicles, 197 Colo. 325, 328, 592 P.2d 402, 404 (1979) ("A judicial construction which harmonizes statutory ambiguities is preferred.").
[5] The Douglas County fee regulations include substantial administrative safeguards, including: (1) a sliding payment scale; (2) limited use of the funds for school facilities; (3) refunds and credits in certain circumstances; (4) specific exemptions; (5) yearly re-examination and review; and (6) accounting and auditing procedures.
[6] In lieu of fees under § 30-28-133(4)(a)(II) provide the counties with very little capital support for building new schools. Boulder County estimates that it will cost between $3.5 million and $4.5 million to build a new elementary school in the Niwot area. In ten years, Boulder County has generated and collected roughly $70,000 as in lieu of fees.