SAVE PARK COUNTY, an unincorporated Association, and Steven H. Cardin, individually, Petitioners,

v.

BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF PARK; Jerry Solberg, Cecil J. Delange, and Lynda M. James in their Official capacity as members of the Board of County Commissioners; Jean Ann Leach, individually; and the Jean Ann Leach Family Limited Partnership, Respondents.

No. 98SC309.

Supreme Court of Colorado, En Banc.

Nov. 29, 1999.

Otten, Johnson, Robinson, Neff & Ragonetti, P.C. Thomas J. Ragonetti, J. Thomas Macdonald, J. Bart Johnson, Denver, Colorado, Attorneys for Petitioners.

Gorsuch Kirgis LLP Robert C. Widner, Paul F. Kennebeck, Denver, Colorado Attorneys for Respondents Board of County Commissioners of the County of Park; Jerry Solberg, Cecil J. Delange, and Lynda M. James, in their official capacity as members of the Board of County Commissioners.

Michael R. Bromley, P.C. Colorado Springs, Colorado Attorney for Respondents Jean Ann Leach, individually; and the Jean Ann Leach Family Limited Partnership.

Justice RICE delivered the Opinion of the Court.

This court granted certiorari to address two issues raised by Petitioners Save Park County and Steven H. Cardin (Petitioners). First, Petitioners challenge whether the court of appeals misapplied this court's decision in *Civil Service Commission v. Doyle*, 174 Colo. 149, 483 P.2d 380 (1971), in determining that the transcript of the public hearings was adequate to permit meaningful judicial review of the Board's decision. *See Save Park County v. Board of County Comm'rs*, 969 P.2d 711 (Colo.App.1998). Second, Petitioners challenge whether the court of appeals correctly determined that section 30–28–136, 9 C.R.S. (1999), was satisfied when there was an eleven-year gap between the time of the referrals and the Board's final decision. We now hold that the court of appeals was correct in applying *Doyle* to determine whether the record of proceedings was adequate to permit meaningful judicial review of the Board's decision. Additionally, we hold that the court of appeals was correct in holding that the Board satisfied statutory requirements when it referred the subdivision plan to various agencies listed in section 30–28–136, and did not abuse its discretion

when it later chose to require supplemental information from some but not all of those agencies.

## I. FACTS AND PROCEDURAL HISTORY

The instant case involves an approved application for a proposed subdivision development in Park County, Colorado. On August 9, 1983, Respondent Jean Ann Leach submitted a preliminary plan for subdivision of her property to the Park County Planning Commission (Planning Commission).[1] In October 1983, the Planning Commission referred the plan to various county and state agencies, as required by section 30-228-136, 9 C.R.S. (1999).[2] On February 14, 1984, the Planning Commission recommended approval of Leach's Preliminary Plan. In February 1986, approximately two years later, Leach filed for approval of the final plat of the proposed subdivision. On February 11, 1986, the Planning Commission approved the final plat and recommended forwarding it to the Park County Board of County Commissioners (Board). Leach did not forward the proposed subdivision plan at that time. Instead, on August 9, 1994, Leach returned to the Planning Commission to seek a determination of whether the 1986 approval had lapsed. The Planning Commission decided that some of the comments from referral agencies were outdated; however, the plans were not re-referred at that time to any of the agencies set forth in the statute.

Thereafter, on December 5, 1994, Leach appeared before the Board, seeking approval of the final plat. The Board determined that new referrals were not necessary, but directed Leach to return once again to the Planning Commission for a formal determination regarding whether the 1986 approval remained valid. The Planning Commission subsequently reconsidered the subdivision and reiterated the initial approval.

On January 17, 1995, the Board began public hearings to consider the final plat. Written and verbal submissions were presented supporting and opposing the subdivision. The Board requested updated information on some issues and Leach provided the information requested. On April 3, 1995, the Board conditionally approved the final plat, requiring Leach to fulfill certain requirements for final approval.

On May, 3, 1995, Petitioners filed an action in Park County District Court against Respondents, the Board of County Commissioners of Park County[3] and Jean Ann Leach, pursuant to C.R.C.P. 106(a)(2) and (4), alleging that the Board failed to comply with state law and county regulations and abused its discretion when it conditionally approved the final plat.

On May 4, 1995, the Board unanimously approved the final plat. After Respondents filed a certified record of the proceedings in the district court, Petitioners moved for summary judgment, asserting that the certified record was so incomplete that it did not permit meaningful review. On June 17, 1996, the district court denied Petitioners' motion for summary judgment, holding that although the record "[left] much to be desired," it was possible to apply the standards for review as set forth in C.R.C.P.106(a)(4).[4]

---

1. Pursuant to section 30-28-133, 9 C.R.S. (1999), counties are required to adopt and enforce regulations governing the subdivision of land. Pursuant to these regulations, in Park County a subdivider obtains approval of a final plat with the County Planning Commission and takes that approved plat to the Board of County Commissioners. The Board, after holding hearings on the application and considering the evidence presented, votes to approve or deny the final plat.

2. The statute at issue, section 30-28-136, is unchanged since Leach first submitted her preliminary plan.

3. When originally filed, the suit was brought against the members of the Board of County Commissioners, Eunice Tokatlogou, Richard Trast, and Doug Walters, in their official capacity. However, since the filing of the suit, the membership of the Board has changed. By operation of law, "[w]hen a public officer is a party to an appeal or other proceedings in the appellate court in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party." C.A.R. 43(c)(1).

4. C.R.C.P. 106(a)(4)(I) states that "[r]eview shall be limited to a determination of whether the

On December 20, 1996, the district court upheld the Board's decision to grant conditional approval to Leach's final plat. The court found that the Board did not abuse its discretion or exceed its jurisdiction in approving Leach's subdivision plan. *See* C.R.C.P. 106(a)(4). The court of appeals upheld the decision of the district court, holding that the record was not so insufficient as to preclude meaningful review and the there was no legal authority requiring updated agency referrals.

We granted certiorari to address whether the court of appeals misapplied this court's decision in *Doyle* when it determined that the transcript of the public hearings was adequate to permit meaningful judicial review of the Board's decision, and whether the court of appeals correctly determined that section 30-28-136 was satisfied when there was an eleven-year gap between the time of the referrals and the Board's final decision.

## II. ANALYSIS

### A. Adequacy of the Record for Review

Petitioners argue that the certified record in this case is so imperfect and incomplete that a meaningful appellate review cannot take place. We disagree based upon our review of this court's prior case law and the record itself.

On two prior occasions, we have considered the adequacy of an appellate record presented for review. First, in *Board of County Commissioners v. Salardino,* 136 Colo. 421, 318 P.2d 596 (1957), the court addressed a situation in which two hearings were held on an application for a retail liquor store license. Although the trial court directed the Board to certify a complete record of the proceedings, only a partial record was filed. Notably, the certified record did not contain any transcript from one of the two hearings held before the Board. We held that when reviewing a decision by a Board where there is *no* record regarding what occurred at a hearing, no judicial determination can be made as

to whether the Board acted within its discretion or whether it acted arbitrarily and capriciously in denying an application. *See id.* at 425, 318 P.2d at 598. Accordingly, we reversed and remanded with directions to the trial court to remand to the Board for a new hearing on the application, the taking and recording of all testimony, exhibits, and other evidence in support of and against the application, and the making of specific findings of fact as to the basis of any grant or denial. *See id.* at 426, 318 P.2d at 598–99.

Fifteen years later, in *Doyle,* the court again addressed the adequacy of an administrative record. The petitioner in that case argued that there could be no effective appellate review because the transcripts of his administrative hearings, although certified as true and complete, were inaccurate. We held that "the burden of providing an adequate record is upon the administrative agency"; however, once a record has been certified by an administrative tribunal to a reviewing court, the burden shifts to the person seeking review to show that there are inaccuracies or imperfections in the certified record that prejudice him. *See Doyle,* 174 Colo. at 154, 483 P.2d at 383. In addition, we held that where the record is imperfect or inaccurate, the court must determine "whether or not the record of proceedings ... reflects competent and sufficient evidence to support the ... Commission's order." *Id.* at 153, 483 P.2d at 382.

The court of appeals relied upon the *Doyle* analysis when it held that the record was adequate for meaningful judicial review. Petitioners assert, however, that the certified transcripts of the Board's hearings in the case are so imperfect and incomplete that they are tantamount to non-existent, thus the court of appeals should have remanded the case for a new hearing pursuant to *Salardino.* We disagree.

In the present case, just as in *Doyle,* a certified record was submitted to the trial court for review.[5] As such, the

---

body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer."

5. This case does not present a "*Salardino*" situation, where reversal and remand were necessary because there was "nothing before [the court] ... from which we [could] determine whether

burden shifts to Petitioner to show that any inaccuracies or imperfections in the record prejudice him on review. *See id.* at 154, 483 P.2d at 383. In addition, to the extent that the record is otherwise imperfect or incomplete, we must determine whether or not the record reflects competent and sufficient evidence to support the order. *See Doyle,* 174 Colo. at 153, 483 P.2d at 382. *Doyle* does not require that the certified record be flawless.

■ *Doyle* analyzes the sufficiency of an administrative record as a whole, including but not limited to any transcripts of administrative hearings. A review of the material contained within the record in this case demonstrates that there is sufficient material to allow for appellate review. The record in this case is comprised of not only the admittedly deficient taped recordings and transcripts of the hearings, but also includes: (1) minutes from the hearings before the Board;[6] (2) documents, maps, plans, photographs, and plats admitted in the record at these meetings; (3) all motions, resolutions, and ordinances of the Board and Planning Commission; (4) all notices sent or published for all meetings and hearings; (5) all memoranda, studies, and recommendations prepared by or for the County Planning Staff relating to the application; (6) all written materials sent or received by the Board, the Planning Commission, or the County Planning staff;[7] and (7) all written materials sent or received by any persons or entities relating to the application.

While the transcripts of the hearings before the Board are incomplete and imperfect, the record itself is nonetheless sufficient to allow appellate review. The totality of the record reveals the arguments addressed by both the proponents and opponents of the application and the Board's basis for its decision. Accordingly, Petitioners have not shown that the imperfections contained in the record prejudiced them upon review. To the contrary, we find that the record, reviewed as a whole, presents sufficient evidence to permit meaningful judicial review of the Board's decision.

### B. Referral Requirement

■ Petitioners also assert that the Board did not satisfy the requirements of section 30–28–136, 9 C.R.S. (1999), which requires the referral of proposed plans to various state and local agencies for comment, in that the Board failed to re-submit the subdivision plans for additional comment before granting final approval. We disagree. The statute is clear and unambiguous in its requirement that boards submit proposed plans to designated agencies for comment. The statute does not require, however, that a board solicit updated comments or make its decision within a certain time frame after the comments are received. Once a board has satisfied the requirements of the statute by submitting the proposed plans for comment, a decision whether or not to require additional comments is within the sound discretion of that board. A board must base its decision on the circumstances of the specific request before it, including a determination of whether, because of the passage of time or any other reason, additional comments would be of material assistance. Our review of the Board's exercise of its discretion is limited to a determination of whether the Board abused

---

the action of the Board ... was arbitrary." *Salardino,* 136 Colo. at 425, 318 P.2d at 598.

6. The minutes taken at the hearings record in some detail the issues raised by various persons and the resulting responses by the Board. For example, a portion of the minutes taken at a meeting held on January 17, 1995, reads:

> There were three conditions to be met in order for Adventure 2 Placer to be approved. Leach had to produce a storm drainage report, drill three tests [sic] wells in subdivision and produce water samples. Michael Bromley, attorney for Jean Leach, stated this subdivision consists of 36 lots containing 2.25 to 3.50 acres

> and is adjacent to Adventure Placer #1.... Petition was submitted with 50 signatures of residents in support of the subdivision.... Brierly stated that there was a critical factor to consider. He said the Commissioners never looked at the Adventure Placer #2, only the Planning Commission, and no sketch plan was done.

Comm'rs Mins. on Jan. 17, 1995.

7. The record contains well over twenty letters documenting the issues raised and addressed by various affected parties, including several letters to the Board from Petitioners, voicing their opposition to the final plat and documenting their specific concerns.

that discretion. *See* C.R.C.P. 106(a)(4). In this case, we find no abuse.

■■■ Turning first to the language of the statute itself, a court's primary task in interpreting a statute is to give effect to the legislative purpose underlying its enactment. *See Griffin v. S.W. Devanney & Co.,* 775 P.2d 555, 559 (Colo.1989). Where the statutory language is clear and unambiguous on its face, there is no need to apply rules of statutory construction because it may be presumed that the legislature meant what it clearly said. *See id.* at 559; *Askew v. Industrial Claim Appeals Office,* 927 P.2d 1333, 1337 (Colo.1996). Furthermore, statutory prescriptions or exemptions dealing with conditions of subdivision approval authority such as the instant statute are to be strictly construed. *See Board of County Comm'rs v. Bainbridge,* 929 P.2d 691, 699 (Colo.1996), *as modified on denial of reh'g,* (Jan. 13, 1997); *Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 935 (Colo.1985).

■■■ Section 30–28–136 is part of a statutory scheme titled "County Planning and Building Codes." These codes, taken together, evidence an intent to promote the "health, safety, morals, convenience, order, prosperity, [and] welfare of the present and future inhabitants of the state." § 30–28–115(1). The referral requirement permits affected agencies to voice any concerns about how a proposed subdivision may adversely impact these goals and to provide a board with the information necessary to evaluate the ability of the area to support the proposed subdivision. *See Shoptaugh v. Board of County Comm'rs,* 37 Colo.App. 39, 42–43, 543 P.2d 524, 527–28 (1975) (holding that the Board acted under proper standards of health, safety, and welfare established by subdivision regulations when it disapproved a plat based on fire danger). Section 30–28–136 unambiguously requires that upon receipt of a complete preliminary plan submission, a board shall distribute proposed plans to various affected agencies, including school districts, municipalities, utility companies, the state engineer, and health and environmental departments. The plain language of the statute does not require a board to seek supplemental comments nor is there any language

in the statute which sets a time frame in which the Board must act after having received the requested comments. As such, the statute is clear on its face and the Board complied with its requirements. *See Griffin,* 775 P.2d at 559.

Nonetheless, Petitioners argue that the Board abused its discretion by not re-submitting the application to the named agencies for additional comments. In support of their position, Petitioners first point out that the Planning Commission at one point recommended that new comments be sought from the relevant agencies. Second, Petitioners allege that the subdivision plan originally submitted included only thirty-four lots, but the final proposal called for thirty-six lots on a larger parcel of land. Third, Petitioners assert that the passage of eleven years between the referral of the proposed subdivision and the Board's final consideration of the subdivision creates a presumption that circumstances in the county had changed so much that new referrals were required.

■■■ Before an abuse of discretion review can be undertaken, we must first determine what discretionary power the statute at issue delegates to a board. Section 30–28–136 states that "[u]pon receipt of a complete preliminary plan submission, the board of county commissioners or its authorized representative ... *shall* distribute copies of prints of the plan [to specifically identified agencies who] *shall* make recommendations within twenty-one days after the mailing ... of such plans." *Id.* (emphasis added). The plain language of this statute places a mandatory, nondiscretionary duty on a county board to refer subdivision plans, leaving no discretion for a board to not refer the plans at all. However, we view this statute as setting a threshold of what a board *must* do to comply with the statute. Once a board has complied with the clear statutory mandate of section 30–28–136, it retains the discretion to seek supplemental comments if it finds such information is necessary in order to properly evaluate the impact a proposed subdivision will have on the local community. *See Shoptaugh,* 37 Colo.App. at 42–43, 543 P.2d at 527–28. The rationale for this discretion is that administrative bodies possess ex-

perience and specialization that place them at an advantage in making these types of decisions. *See State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1195 (Colo.1994) (identifying board's technical and administrative expertise as rationale for recognizing discretion); *Colorado Pub. Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1579 (10th Cir.1991) (stating that courts should defer to the judgment of an administrative agency regarding topics within the agency area of expertise). Absent such discretion, the intent of the statute would be frustrated, as county boards would be stripped of their ability to request the information they deem necessary to evaluate the impact of a proposed subdivision on their local community.

██ In the present case, the Park County Planning Director[8] complied with the statute by mailing the plans to the various referral agencies in October 1983. However, Leach did not file for approval of the final plat with the Planning Commission until February 1986, and did not appear before the Board seeking final approval until December 1994. The record indicates that the Board considered the issue of whether, pursuant to the statute, updated comments were necessary once Leach sought final approval of the plat. Specifically, at the December 5, 1994 meeting, one commissioner noted that "there are some geological studies and some other information from other sources that may not have changed, but the rest of it will have to be resubmitted and brought to the planning commission again." In addition, at the January 4, 1995 meeting before the Board, a number of interested parties raised concerns over the passage of time, including resulting potential changes in water quality and supply, radiation levels, storm drainage, and wildfire concerns.

The Board considered and evaluated these concerns through the taking of verbal testimony and updated letters from various agencies and parties. In particular, the Board considered updated letters from: (1) the Division of Wildlife, addressing storm drainage issues and recommending well water testing;

(2) the Park County Environmental Health and Preservation Department and the Advisory Board on the Environment, recommending fencing restrictions, well water testing, conservation easements, drainage plans, and ground water testing; (3) the Park County Environmental Health and Preservation Department, regarding sewage disposal; (4) the town of Alma, taking no position on the application; (5) the Colorado Division of Wildlife, addressing concerns relating to deer, elk, and bear populations in the affected area; (6) the Colorado Department of Public Health and Environment, regarding drinking water testing; (7) the Army Corps of Engineers, addressing wetlands issues; and (8) the Park County Building & Zoning Department, recommending approval of the application.

Based on the verbal and written materials submitted on the record, the Board eventually narrowed its concerns to three issues and made its approval contingent upon Leach: (1) preparing a storm drainage report or submitting an opinion from an engineer that such a report was not necessary; (2) drilling three test wells in the subdivision; and (3) testing water samples for standard water requirements. After Leach complied with the above requirements, the Board unanimously approved her application on May 4, 1995.

Our review of the record indicates that the Board relied upon its administrative experience and expertise to determine that although requests for updated information from all agencies were unnecessary, some updated information was required in order to make an informed decision to grant Leach's subdivision plat. The Board obtained the information necessary to make an informed decision and evaluated it. Accordingly, we hold that the Board did not abuse its discretion when it chose not to send Leach's application to all agencies a second time pursuant to section 30–28–136, but instead sought any supplemental information it found necessary to reach an informed decision regarding Leach's subdivision proposal.

---

**8.** Section 30–28–136 directs the board of county commissioners or its authorized representative to distribute the proposal.

## III. CONCLUSION

We hold that the court of appeals correctly applied *Doyle* to determine whether the record of proceedings was adequate to permit meaningful judicial review of the Board's decision. In addition, we hold that the court of appeals correctly held that the Board did not err in failing to require updated referrals because section 30–28–136 does not contain a time limit that required Leach's subdivision plans to be re-referred and the Board acted within its discretion in when it did not seek supplemental information from *all* agencies. Accordingly, we affirm the judgment of the court of appeals.

Justice HOBBS, concurring in part and dissenting in part:

I agree that the record is sufficient for review of the Board's decision. Because the Board acted without the benefit of contemporaneous information required by statute, however, I respectfully dissent from Part II.B of the court's opinion. I would hold that the Board abused its discretion by failing to re-refer the subdivision plan for current comment to all of the reviewing agencies specified in section 30-28-136, 9 C.R.S. (1999).[1]

The majority states the facts clearly; essentially, Respondent Jean Ann Leach (the subdivider) delayed eight years from the Planning Commission's approval of her Preliminary Plan before seeking approval of the final plan and plat from the Board of County Commissioners (Board). The Board correctly recognized that this situation required referring her application back to the Planning Commission. Instead of circulating her proposal to all of the reviewing agencies specified in section 30–28–136, however, the Planning Commission engaged in an ad-hoc consultation with only some of those agencies. Consequently, the Board's subsequent approval lacked the benefit of reasonably contemporaneous review by each of the agencies specified in the statute.

In my view, the purpose of section 30–28–136, within the context of the legislature's land use statutes, is to assure that local decisionmakers have the benefit of expert review that is reasonably contemporaneous with the Board's consideration of any subdivision plan and plat. Here, more than ten years elapsed between the initial referral to the section 30–28–136 agencies and the Board's final approval of the subdivider's plan and plat. Accordingly, the Board's failure to consult with all of the agencies specified in section 30–28–136 before approving the plan frustrated the General Assembly's purpose and should be held to constitute an abuse of discretion warranting reversal under C.R.C.P. 106(a)(4).[2]

## I.

Colorado is one of the fastest growing states in the nation. Its natural resources and its existing infrastructure for delivery of crucial services, including schools, water, sewer, and parks, are undergoing tremendous stress. The Department of Local Affairs estimates that Colorado added 466,325 new residents between July 1993 and July

---

1. The statute specifies that subdivision plans be submitted to: (a) the appropriate school districts; (b) each county or municipality within a two-mile radius of the proposed subdivision; (c) any utility, local improvement and service district, or ditch company, when applicable; (d) the Colorado Forest Service, when applicable; (e) the appropriate planning commission; (f) the local soil conservation district board; (g) when applicable, to the county, district, or regional health department or the state department of health for sewage disposal and water quality review; (h) the state engineer and any municipality or quasi-municipality designated as a water source for the subdivision; (i) the Colorado Geological Survey. *See* § 30–28–136(1). Park County's own subdivision regulations require submission to the same agencies, and also require submission to the U.S. Forest Service, U.S. Bureau of Land Manage-

ment, or Colorado State Land Board, when applicable. *See* Park County Subdivision Regulations, Art. IV § D.1.

2. Rule 106(a)(4) provides relief to those aggrieved by a quasi-judicial act when the governmental agency abuses its discretion. Although we will not ordinarily find an abuse of discretion unless there is an absence of competent evidence in the record to support the governmental agency's decision, *see Board of Comm'rs of Routt County v. O'Dell*, 920 P.2d 48, 50 (Colo.1996), a misinterpretation or misapplication of governing law by an agency is an alternative ground for finding an abuse of discretion under Rule 106(a)(4). *See Board of County Comm'rs v. Conder*, 927 P.2d 1339, 1343 (Colo.1996).

1998, an increase of nearly 13% in five years. *See* Department of Local Affairs, *Colorado County Population Estimates.*[3] Park County's population nearly doubled from 1990 to 1998, while Douglas County's population more than doubled in that period. *See id.* Many other counties experienced similarly rapid growth.

The General Assembly has long recognized the importance of intelligently managing growth in Colorado. *See* § 24–65–102, 7 C.R.S. (1999) (Colorado Land Use Act) ("The general assembly finds and declares that the rapid growth and development of the state and the resulting demands on its land resources make new and innovative measures necessary to encourage planned and orderly land use development.") Local land use regulation—taking into account statewide interests—is the mechanism our legislature has chosen as the primary vehicle for ensuring the safekeeping and nurturing of Colorado as it grows. *See* § 29–20–102, 9 C.R.S. (1999).

This case might appear to involve decisions having a de minimis impact: the subdivision is small—36 lots—and the Planning Commission did reconsult with some of the reviewing agencies. Nevertheless, the legal issue presented is fundamental to how Colorado evaluates growth impacts in the planning process. If some subdividers can cause a significant delay to accommodate their own considerations, yet be allowed to obtain final approval of their subdivisions based on very old consulting agency review, they will not be required to account for current conditions that subdividers with new applications must address. Public resources will inevitably be called upon to absorb the unexamined, unaddressed consequences.

### A.

*Purpose of the Agency Review Provision*

Section 30–28–136, as the majority notes, is silent on the issue of whether the agency review specified in that section must occur reasonably contemporaneously with Board approval. I disagree, however, that the statute's silence indicates the legislature consid-ered this issue and resolved not to include a provision regarding outdated agency review. We must construe the statute to give it effect under a variety of circumstances—including those that the legislature did not specifically address, yet nonetheless intended to be covered. *See Park County Sportsmen's Ranch LLP v. Bargas,* 986 P.2d 262, 268 (Colo. 1999); *Buckley v. Chilcutt,* 968 P.2d 112, 117 (Colo.1998); *In re Estate of Royal,* 826 P.2d 1236, 1238 (Colo.1992) ("Since the statute is silent, we must abide by the well-settled rule of statutory construction that statutes should be construed to effectuate the General Assembly's intent and the beneficial purpose of the legislative measure.")

Our land use cases have recognized that legislative silence on a particular issue does not require courts to cease their efforts to ascertain legislative intent and purpose, and construe the statute reasonably to address the issue at hand. *See Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 935 (Colo.1985). The purpose of section 30–28–136 is clear. The legislature has required counties to obtain the opinions of interested agencies; implicit in this legislative design is that the consultation must be reasonably contemporaneous with the land use decisionmaking process, so that current circumstances inform the agencies' opinions, and, ultimately, the Board's decision.

The legislative concern with intelligent, coordinated, and effective growth management is visible not only in section 30–28–136 and the larger Article 28 of which it is a part, but throughout Colorado's land use statutes. Section 30–28–107, 9 C.R.S. (1999), for instance, relates to preparation of county and regional master plans; it states that the plans are to be made "with the general purpose of guiding and accomplishing a *coordinated,* adjusted, and harmonious development." (Emphasis added.) Section 24–65–102(1), 7 C.R.S. (1999), the legislative declaration section of the Colorado Land Use Act, recites that "an increasing mutuality of interest and responsibility between the various levels of government in the state . . . calls for *coordinate and unified* policies in planning

---

**3.** <http://www.dlg.oem2.state.co.us/demog/esti-     mate.htm> (visited 11/16/99).

for growth and development." (Emphasis added.) The statute "clarify[ing] and provid[ing]" authority to local governments in the land use context provides that "[l]ocal governments are authorized and encouraged to cooperate or contract with other units of government . . . for the purposes of planning or regulating the development of land." §§ 29-20-102 and 29-20-105(1), 9 C.R.S. (1999). These statutes—and, of course, section 30-28-136 itself—make clear that coordinated, well-informed decisionmaking is at the heart of the exercise of land use authority by local government, not merely a technical procedural requirement.

The majority correctly notes that section 30-28-136 does not specifically provide for re-referral of subdivision plans when a considerable period of time lapses between preliminary subdivision approval and submission of a final plat. This is not surprising. The General Assembly required under section 30-28-136(2) that the reviewing agencies respond within twenty-one days of the local government referral. It thereby anticipated that the local decisionmaking process would proceed expeditiously. Thus, the purpose of section 30-28-136 is manifest: to (1) require counties to consider the views of those agencies with expertise in the various resources that are impacted by subdivision growth, and (2) ensure that the information provided by the agencies is current, expeditiously provided, and considered by the land use decisionmaker.

## B.

### Defeat Of Legislative Purpose

The majority defers to the Board's decision here to seek updated comments from some, but not all, interested agencies. Deference to the Board's "experience and specialization," *see* maj. op. at 40–41, should not obviate the role of the consulting agencies—especially as to matters outside the Board's expertise and experience. It is the various agencies to which the board must refer the subdivision plan—not the Board itself—that possess the expertise with which section 30-28-136 is concerned. Allowing the Board to ignore agencies and information that the legislature intended to inform its deliberations

defeats the purpose underlying the mandatory submissions required by section 30-28-136.

The statute requires that the Board receive comments from diverse agencies precisely because the General Assembly recognized that county commissioners do not themselves have the resources to correctly discern or predict how problems of particular concern to, and within the expertise of, the reviewing agency may be presented. Although Park County's relatively sparse population makes it plausible that its Board of County Commissioners might be well-informed regarding changes that have taken place in the community over time, even there it is more prudent—and consistent with the legislature's purpose—to require the Board to hear from the experts than to rely exclusively on its own judgment and perception of current circumstances.

Thus, the majority's conclusion—that the Board complied with the statute and was free to exercise its discretion as to whether re-referral was required—makes sense only if the passage of time has negligible impact on the legislative purpose of encouraging intelligent, coordinated growth. Given the reality that growth pressures accumulate over time, it is not reasonable to conclude that a more than ten-year delay in granting final approval of the subdivision plan from the date of initial agency comments has no bearing on the natural resources and infrastructure needs that the various reviewing agencies are called upon to address and protect under the statute.

Specific components of the statutory scheme illustrate the importance of how the passage of time can affect evaluation of a subdivision proposal. Section 30-28-136(1)(h)(II), for instance, requires municipalities to report how much water is available to a subdivision, and the state engineer's office makes its own approval under that section contingent on a satisfactory demonstration that the municipality or water district can and will provide that supply. *See* State Engineer, Guidelines for Subdivision

Water Supply Reports.[4]  Clearly, the amount of excess supply held by a municipality or water district can diminish over time as other developments proceed.  Much the same can be said of reports relating to potential flood hazards required under section 30–28–136(1)(f);  available sewage treatment capacity and water quality under section 30–28–136(1)(g);  and, of course, available school capacity under section 30–28–136(1)(a).

The legislature has made especially clear that the subdivision approval process is the context for examining the ability of the local schools to serve the residents of the new subdivision: "the General Assembly has designated subdivision regulations and subdivision review, taking into account recommendations of the commenting agencies, as the context for evaluating the educational opportunity which will be afforded to the future residents of the platted lots." *See County Comm'rs of Douglas v. Bainbridge*, 929 P.2d 691, 701 (Colo.1996).  Section 30–28–136(2) provides that the waiver of comment imposed upon other agencies if the very limited review time expires specifically does not apply to school districts:

> The failure of any agency to respond within twenty-one days or within the period of an extension shall, for the purpose of the hearing on the plan, be deemed an approval of such plan; except that, where such plan involves twenty or more dwelling units, a school district shall be required to submit within said time limit specific recommendations with respect to the adequacy of school sites and the adequacy of school structures.

With respect to schools, the General Assembly could not have been clearer.  The ability of the schools to handle the new growth is so important as to *require* the local school district to provide information to the local government land use decisionmaker; necessarily implied is the duty of the decisionmaker to ask the school district for current information before it gives final subdivi-

sion approval when the subdivider has caused an unreasonable delay in the Board's consideration of final subdivision plan and plat approval.  The use of outdated school district comments, especially in a time of rapid growth, undercuts the legislative purpose that focuses on the subdivision approval process as the context for addressing school availability for the new residents.

C.

### How Much Delay Requires Reconsultation

How much delay between an initial referral for agency comments and actual final approval of a subdivision plan will constitute delay sufficient to require reconsultation with the agencies?  No hard and fast rule would be workable here;  instead, as courts often do, we must decide whether the Board's failure to obtain relatively current review by the agencies constituted an abuse of discretion under the circumstances.  When there is evidence that significant new information is available, or that significant changes have taken place in the community, or when the Board itself (as here) decides to re-refer the matter of subdivision approval to its Planning Commission because of delay, the statutory agency consultation requirement should be triggered.

Because it does not account for the importance of how growth impacts increase over time, the majority's position would in effect allow speculation at the expense of the resources the General Assembly sought to protect through the subdivision statutes.  A person with an initial approval may delay final approval without being held to conditions or mitigation requirements that new applicants in the same geographical area must take into account.  This result is quite clearly inconsistent with the "familiar concept" that "development pay all or part of its way." *Bainbridge*, 929 P.2d at 698.  And because the referral agencies cannot be expected to track every development proposal independently,[5]

4.  <http://www.dnr.state.co.us/water/guidelines for subdivision water supply plans.html> (visited 11/17/99).

5.  The State Engineer's guidance on section 30–28–136 states explicitly that it will respond to a

subdivision proposal only on referral from County authorities.  *See* State Engineer, Guidelines for Subdivision Water Supply Reports, *supra*.

it would be unrealistic to expect these agencies to submit comments without notification from the Board that action was impending. Here, the subdivider patently caused the delay—not any of the reviewing agencies, not the Planning Commission, and not the Board. The Board recognized that the delay necessitated obtaining updated review by the Planning Commission. Under these circumstances, the Board should have required the Planning Commission to reconsult with all of the reviewing agencies and, in particular, obtain current information from the local school district. I would hold that its failure to do so was an abuse of its discretion.

## II.

Accordingly, I respectfully dissent from Part II.B. of the court's opinion.

Justice SCOTT joins in this concurrence and dissent.